Daniel, J.
delivered his opinion in the case of Brooke v. Shacklett, but it applies equally to both cases :
In the case of Gallego's ex'ors v. Attorney General, 3 Leigh 450, decided by this court in 1832, it was held that the courts of chancery in this state had ho jurisdiction to enforce devises and bequests to religious societies or congregations. The court said, that as the statute of charitable uses, 43 Eliz. under which alone such vague bequests could be established, if ever in force in Virginia, had been repealed in 1792, in the general repeal of English statutes, charitable bequests were to be treated as standing on the same footing with other bequests. If definite, they were to be treated as trusts which courts of equity would execute by virtue of their ordinary jurisdiction; but if indefinite, they were no longer recognized by law, and could not be enforced: And a devise or bequest of property to or for the uses of a religious congregation was, it was said, of the character last mentioned. It was too uncertain as to the beneficiaries.
The reasoning of the court, it is obvious, applies *310 with equal force to a conveyance of property to a religious congregation by deed.
I do not deem it at all necessary to enquire how far the decision in the case just cited may conform to the views of courts elsewhere in respect to this branch of the law, inasmuch as I am -not aware that the authority of the case as a true exposition of the law in this state, has been ever seriously questioned. If, therefore, the law now stood as it did prior to the passage of certain acts whose provisions will be presently noticed, I should find no difficulty in holding that the bill of the appellee ought to have been dismissed as stating no case for the jurisdiction of a court of equity. For though there can be no reverter of the property in question to the grantor or his heirs, inasmuch as the deed purports to be founded on a valuable consideration, and contains a warranty warranting to the trus'tees and their successors, the property, against the claim of the grantors, their heirs, and all persons claiming by or under them; Yet the same indefiniteness as to the beneficiaries which defeated the bequest to the Roman Catholic congregation in Gallego's ex’ors v. Attorney General, is to be found in the deed here, and would present an insuperable difficulty in the way of the court’s undertaking to control the trustees in the performance of their duties, at the instance of a beneficiary in the deed, whether he claimed a use in the property as a member of the Methodist Episcopal church, or as a member of the congregation of that church, worshiping at Salem church-house. It becomes necessary, therefore, to examine the acts of assembly just mentioned, and to enquire whether the trusts of the deed can be brought within the scope of their provisions.
The first of the acts to which I refer, is the act entitled an act concerning conveyances or devises of places of public worship, passed February 3d, 1842. *311 This act in substance declares, that where any lot or parcel of land has been heretofore, or shall be hereafter, conveyed to one or more trustees for the use and benefit of any religious congregation as and for a place of public worship, the same and all improvements thereupon shall be held by such trustee or trustees, and their successors, for the purposes of the trust, and not otherwise; that where such conveyance or devise has been heretofore made to trustees, or where such conveyance or devise shall hereafter be made, whether by the intervention of trustees or not, the Circuit superior court of law and chancery for the county or corporation where the property is situate, shall, on application of the attorney for the commonwealth on behalf of the authorized authorities of any such religious congregation, have power and authority to appoint trustees originally where there were none, or to substitute others from time to time, in cases of death, removal from the county or corporation, or other inability to execute the trust beneficially and conveniently; and the legal title shall thereupon become exclusively vested in the whole number of the then trustees, and their successors. The act, after further providing that a majority of the acting trustees of any such congregation may sue and be sued in relation to the title, possession or enjoyment of such property, concludes with a proviso, that such trustees, for the use of a religious congregation, shall not hereafter take or hold at any one time any tract of land in the country, exceeding in quantity thirty acres, or in any incorporated town, exceeding two acres; and that such real property shall not be held by them for any other use than as a place of public worship, religious or other instruction, burial ground and residence of their minister. The next in order is the act of 1S46-7, which gives to any one or more of the members of any religious congregation the right, in his or their *312 names, on behalf of such congregation, to commence au<^ prosecute a suit in equity against the trustees, to compel them to apply the property for the use or benefit of the congregation, as their duty shall require. In 1849 these acts were substantially re-enacted and are embodied in the Code, in the eighth, ninth, tenth, eleventh, twelfth and thirteenth sections of chapter 77. The only material changes made by these sections of the Code in the provisions of the acts of 1842 and 1846-7, are those to be found in the eighth and tenth sections ; by the former of which, validity is given not only to every conveyance and devise, but also-to every dedication of property for the uses aforesaid; and by the latter of which it is declared that when books or furniture shall be given or acquired for the benefit of such congregation, to be used on the said land in the ceremonies of public worship, or at the residence of their minister, the same shall stand vested in the trustees having the legal title to the land, to be held by them as the land is held, for the benefit of the congregation.^'
There is, I think, nothing in the language of these laws to show that the legislature designed to confer peculiar benefits on any particular religious sect or sects. And the manifestation of any such design would not only have been utterly at war with the whole spirit of our institutions, but in direct conflict with the letter of the constitution declaring that the legislature “shall not confer any peculiar privileges or advantages on any one sect or denomination.” The terms of the acts are broad enough to embrace not only such congregations as may be independent of others, choosing their own pastors, and making the laws for their own government, but also such as may be united with other congregations under a common government, from which they may respectively receive the pastors that are to instruct them or the laws that *313 are to regulate them, without having any voice either in the selection or appointment of the former, or in the framing or enactment of the latter. And such is, I think, the obvious design of the legislature. The benefits which these acts confer are intended for any and every religious congregation, without regard to the peculiarities of religious faith or the forms of church government. It is, however, equally obvious that the conveyances, devises and dedications to which the acts mean to give validity, are conveyances, devises and dedications of property for the use of the “religious congregations” therein mentioned, in the limited and local sense of the term, viz : for the members (of these religious congregations) as such, who, from their residence at or near the place of public worship, may be expected to use it for such purpose. This interpretation is to be drawn from the general tenor of the acts, but more especially from the language of those portions of them that stand in the Code as the eighth and tenth sections of the chapter before referred to.. The dedications of real estate must be made for the use of the “ religious congregation, as a place for public worship, or as a burial place, or a residence for a minister;” and that of the “books and furniture,” “ for the benefit of such congregation, to be used on the said land in the ceremonies of public worship, or at the residence of their ministeruses, which it is plain, from their very nature and the connection in which they are mentioned, must belong peculiarly to the local society, “the religious congregation” at or near the locality of the property conveyed. Ho dedication of property to religious uses, which does not respect these rights of the local society or religious congregation, no deed which does not design such enjoyment of the uses of the property conveyed, by the local religious society or congregation, can be placed within the influence and protection of the statutes.
*314 The deed under consideration, in its first clause or declaration of trusts, provides that the trustees are to hold the property conveyed to them, and their successors forever, in trust that they shall build or cause to be built thereon a house or place of worship for the use of the members of the Methodist Episcopal church in the United States of America, according to the rules and discipline which from time to time may be agreed upon apd adopted by the ministers and preachers of the said church, at their general conferences in the United States of America; and in further trust and confidence that they shall at all times forever hereafter permit such ministers and preachers belonging to said church, as shall from time to time be duly authorized by the general conferences of the ministers and preachers of the said Methodist Episcopal church, or by the annual conferences authorized by the said general conference,- to preach and expound Q-od’s holy word therein.
I am free to admit, that the first impression which this clause of the deed is calculated to make is that of a declaration of trust, not for the benefit of a local society, or congregation of Methodists worshiping or expected to worship at a particular place, but for the benefit of the “Methodist Episcopal church in the United States as an aggregate body or sect,” to the exclusion of any peculiar" rights of property in the land conveyed, in such local society or congregation. And if such is the true interpretation to be given the deed, it would plainly stand, for reasons already mentioned, out of the influence and operation of the statutes. Upon a fuller and more rigid examination of the deed, however, in which I have been much aided by the clear and forcible views presented by Chief Justice Marshall of Kentucky, in announcing the interpretation placed by the Supreme court of that state-, on a deed identical in its features with the deed under *315 consideration, (see Gibson v. Armstrong, 7 B. Monr. R. 481,) I have come to the conclusion that the deed is entitled to be regarded as substantially a of the property therein mentioned, to the uses of the local society. And that said property is thus placed within the pale of the statutes.
It is to be observed, as already stated, that the house or place of worship to be erected is to be for the ..use of the members of the Methodist Episcopal church, &c.; and as the members of the local society are necessarily members of the Methodist Episcopal church, in the sense in which the term is used in the deed, it follows that the land is conveyed for the benefit, to some extent at least, of the local society or congregation. It is to be noted further also, that except upon the happening of a certain contingency, the deed contemplates the perpetual use of the property as a place of worship. And it is obvious, from the nature of things, that the usual occupancy of the property, in attending upon the preaching and exhortations of their minister and in meeting for the observance of the various religious duties and exercises enjoined upon its members by the rules of the church, is one that can be enjoyed only by the local society; and that any use or occupancy of the house by other members of the .church must be necessarily casual and infrequent; so much so as not to interfere with the full use and enjoyment of it as a place of worship by the local members. Hence it is fairly inferrible that the former use and not the latter was mainly if not exclusively within the contemplation of the parties to the deed. This view is made still more apparent in the subsequent declaration of the trusts. The deed proceeds to provide further, that in case one or more of the trustees die or cease to be a member or members of the said church, the stationed minister or preacher who shall have the pastoral charge of the *316 members of the said church, (meaning plainly the so-°iety>) is to call a meeting of the remaining trustees, who, upon his nomination, are to appoint one or more Persons> who shall have been one year a member or members of said church, to fill such vacancy: showing that the minister provided for m the deed is to have charge of the members of the local society; who, consequently, are expected to attend upon and receive his religious instructions and ministrations; and ..who are thus necessarily the members that are, peculiarly, to enjoy the occupancy of the house as a place of worship. And in the next and last clause, in which, upon a certain contingency, provision is made for the sale of the property for the discharge of debts incurred by the trustees on account of the premises, the surplus arising from the sale, after paying the debts, is directed to be placed in the hands of the steward of the society attending divine service on the premises, and is to be disposed of by the next yearly conference, according to the best of their judgment, for the use of said society.
Does not this provision strongly persuade to the conclusion of a design that, in the event no sale of the property-is ever required, or until it is required, the immediate control and peculiar use of the property is to be and remain with the local society, by the contribution of whose members, in the main, (as is stated in the bill and not denied in the answer,) the church-house was erected, and to whose use the surplus proceeds of the property, in the event of a sale, are to be appropriated ?
“ The primary object of the whole transaction, (in the language of Chief Justice Marshall in the case befoi'e cited,) must necessarily have been to provide and secure a place of worship according to the Methodist Episcopal discipline for the local society of that denomination, by and for which contributions *317 were made, and which was expected to attend worship on the premises. The members of the Methodist Episcopal church at large, not belonging to the society, can, in a general view, have no other use of the local premises but through the instrumentality °f the local society, and by means of the subordination of the local use to the laws and authority of the church at large.”
_
_ The provision that the trustees are at all times to permit the ministers and preachers belonging to the Methodist Episcopal church, who shall be duly authorized by the conferences of the church, to preach in the house to be erected, it is obvious, cannot in any degree detract from the character and effect of the deed as a dedication of property to the use and benefit of a religious congregation, in conformity with the statute. For the religious congregations, whose worship is not conducted under the lead and instruction of a minister, are comparatively few in number, and it is expressly provided in the statutes, as we have seen, that one of the uses to which the property dedicated may be applied, is, as “ a residence for a minister.” The only ground, therefore, on which it can be argued that this feature of the deed places it without the pale of the statute, is, that it sanctions the appointment of the ministers, and authorizes them to use the house for preaching, without any reference to the vote or wish of the congregation. It is true, that under the deed, and according to the rules and discipline therein referred to, the local societies have no voice in the selection of their ministers. But it does not follow that the deed therefore fails to fulfill any requirement of the statute, or is in any regard in conflict with its spirit. It could not have been unknown to the legislature that a large number of the religious congregations in the state are in such predicament; receiving their ministers from bodies who are bound by no rule *318 of church government to consult the preferences of the local societies or congregations in appointing the pastors who are to have charge of them. To declare the deed objectionable and invalid because of the feature in question, would therefore be to impute to the legislature the design of making a most unjust and invidious discrimination against all the congregations just mentioned, and in favor of those who have the selection of their own pastors. Such an idea is wholly inadmissible. Upon the whole, therefore, though some of the provisions of the deed, upon a first inspection, did seem to me to look another wTay, I am satisfied that it does import a substantial dedication of the property therein mentioned to the uses of the local society, and that we cannot reject it, without adopting in respect to it, rules of construction favorable to the defeat rather than the upholding of such instruments : And I cannot see that we have the warrant of any sufficient reason for such a course.
The dangers to be apprehended from church establishments, and the evils likely to flow from allowing them to acquire property under such broad powers as were at one time claimed and exercised by the chancellor in England as representing the superintendency of the crown, as parens patrice, over charities, might be; very properly looked to and considered by a court engaged, as this court was, in the case of Gallego's ex'ors v. Attorney General, in enquiring whether it had been left free to exercise a jurisdiction, which when once admitted it had no power to limit by any well defined boundaries. The subject is however presented to our consideration under circumstances wholly different.. The transfer and acquisition of property for religious purposes has been made the subject of a legislation in which the extent and the uses to which dedications of this character may be made, are precisely fixed and ascertained. The legislature has de *319 dared that permanency may be legally assured to the houses of worship, the pastoral residences, and the burial places of the various religious congregations the country. They have given the form and sanction of law to the opinion that the good to the community likely to result from placing the title to such property on a firm and certain footing, and thus putting an end, as far as the law can, to the unseemly disorder that might otherwise arise from leaving it to the uncertain tenure by which it has been hitherto held, is of such character and weight as to overbalance any vague apprehension that the object may not be attained without furnishing occasion for ecclesiastical encroachments dangerous to the institutions of the state. This course of the legislature has been approved by the convention of 1850-51, and in the 32d section of the 4th article of our new constitution it is declared, that the general assembly may secure the title to church property to an extent to be limited by law; whilst an additional guard against the dangers adverted to is thrown around the subject by a provision that there shall not be any grants of charters of incorporation to any church or religious denomination.
In passing now, therefore, on such a deed as the one under consideration, no jealousy of the extension of ecclesiastical power can be properly allowed to exert an influence in the selection of the rules of interpretation to be applied. On the contrary, we should rather favor that interpretation of the instrument which, consistently with the rules of construction, will place it within the operation of the changed policy of our legislation.
The deed being valid, as we must, I think, hold it to be, all doubt as to the jurisdiction of the court is ended; and we have to decide which of the two parties litigant are entitled to the use of the property which the deed conveys. There is no dispute between *320 the parties about any matter of religious faith. The doctrines of the two parties are identical. Neither party denies that the ministers of the other are, in the doctrinal sense of the word, members of the Metho®P^SC0Pa^ church. But it is most obvious that “simply holding the same faith, without submitting to the government and discipline of a church, cannot make or keep a man a member of that church. To constitute a member of any church, two points at least are essential, without meaning to say that others are not so, a profession of its faith and a submission to its government.” Den v. Bolton, 7 Halst. R. 215.
The local society of which both of the parties litigant claim to be members, is not a separate and independent society or congregation making its own laws, but is one of a large number of local societies belonging (prior to a division of the church which will be presently noticed) to the Methodist Episcopal church in the United States. According to the plan of church government, annual conferences were composed of the traveling preachers within certain boundaries fixed by the general conference. The preachers were received into the church by the annual conferences, and distributed ;or assigned to their several charges by the bishops. The general conference was composed of one for every member of each annual conference appointed either by seniority or choice at the discretion of each annual conference; Yet so that such representatives should have traveled at least a certain number of years. The general conference elected the bishops, and had “ full powers to make rules and regulations for the church under certain specified limitations and restrictions.” The members of the local societies had no right to be represented by delegates either in the annual conferences or in the general conference. They had no voice in making the rules for the government of the church; none in the appointment or selection *321 of the preacher to whose charge they might be committed. If at any time before the division of the church a controversy had arisen among the members of the society at Salem church-house, in respect to the occupancy of the house — each party under the lead of a preacher claiming its exclusive use for purposes of worship — the dispute must have been determined by enquiring, not which of the two parties constituted a majority, or represented the wishes of a majority, of the members of the society, but which of the two preachers had been appointed and assigned to the society in accordance to the laws of the church; which of the two parties was acting in conformity with the discipline of the church, and submitting to its lawful government.
These views conduct us necessarily to the enquiry as to what effect the division of the church is to have on the control of the uses of the houses of worship by the local societies.
I do not deem it necessary to go into any statement of the causes which led to this division, which was effected under certain resolutions adopted by the general conference in 1844. The resolutions are preceded by a preamble setting forth that a declaration had been presented with the signatures of fifty-one delegates of the body from thirteen annual conferences the slaveholding states, representing that for various reasons enumerated, the objects and purposes of the Christian ministry and church organization could not be successfully accomplished by them under the jurisdiction of the general conference as then constituted; and that in the event of a separation, a contingency to which the declaration asked attention as not improbable, the conference esteemed it a duty to meet the emergency with Christian kindness and the strictest equity.
The first resolution declares, that should the dele *322 gates from the annual conferences in the slaveholding ° . ° states find it necessary to unite in a distinct ecclesiastical connection, the following rule shall be observed with regard to the northern boundary of such connec^on : the societies, stations and conferences ad-Bering °bm'ch in the south by a vote of a majority of the members of said societies, stations ar)d conferences, shall remain under the unmolested pastoral care of the southern church; (and the ministers of the Methodist Episcopal church shall in no • case attempt to organize churches or societies within the limits of the church south; nor shall they attempt to exercise any pastoral oversight therein, it being understood that the ministry of the south reciprocally observe the same rule in relation to stations, societies and conferences adhering by vote of a majority to‘the Methodist Episcopal church;) provided also that this rule shall apply only to societies, stations- and conferences bordering on the line of division, and not to interior charges, which shall in all cases be left to the care of that church within whose territory they are situated.
By the second resolution it is declared that ministers, local and traveling, of every grade and office in the Methodist Episcopal church may, as they prefer, remain in that church, or, without blame, attach themselves to the church south.
And by the ninth it is declared that all the property of the Methodist-Episcopal church, in meeting-houses, •parsonages, colleges, schools, conference funds, cemeteries, and of every kind, within the limits of the southern organization, shall be forever free from any claim set up on the part of the Methodist Episcopal church, so far as this resolution can be of force in the premises.
In May of the following year (1845) delegates, regularly appointed by the several annual conferences of *323 the Methodist Episcopal church in the slaveholding states, met in Louisville, Kentucky, iñ a general convention, and adopted by a vote (of ninety-four to three) a resolution by which they declare the jurisdiction hitherto exercised over said annual conferences by the J general conference of the Methodist Episcopal church entirely dissolved; and that said.annual conferences shall be and they hereby are constituted a separate ecclesiastical connection under the provisional plan of separation aforesaid, and based upon the discipline of the Methodist Episcopal church, comprehending the doctrines and entire moral, ecclesiastical and economical rules and regulations of said discipline, except only in so far as verbal alterations may be necessary to a distinct organization, and to be known by the style and title of the Methodist Episcopal Church South.
If this division of the church was lawful, it is obvious, I think, that the members of the local societies in the southern organization of the church stand in the same relation to the general conference, the annual conferences, the bishops, pastors, rules and discipline of the Methodist Episcopal church south, that they occupied before the division, in respect to those of the Methodist Episcopal church. There has been no change of faith, no change of doctrine, no change of discipline, no change in the mode of administering it: All remain as before. By the express terms of the plan of separation, no blame is to be attached to the pastors in the south for adhering to the church south; and the members of the local societies are to remain under the unmolested care of the southern church, as they were before under that of the Methodist Episcopal church. And the southern church is to occupy the same relation to the church property in the south that the Methodist Episcopal church before occupied in respect to it. If the division has been lawfully effected, why may not a controversy among the local *324 members of a society iu respect to the use of the church property be settled by a resort to the same mode of enquiry, (merely changing the name of the church,) that would have determined it before ? Upon the hypothesis that the plan of separation is constitutional, the questions upon which such a controversy would now turn, would be, Which of the two parties is in regular connection with the Methodist Episcopal church south, recognizing its discipline, submitting to its government, and receiving its pastors? Those who can identify themselves with the party indicated in the enquiry, are entitled to the use of the property.
We have still to enquire, Whether the general conference of 1844 had the power to adopt the resolutions authorizing the division ? If I had the largest freedom of time and space, I should not desire to pursue any very extended course of statement or of argument in considering this question. And I do not think that there is any necessity for my doing so. The question is one which has been deemed for some years past of such public concernment, of such vast importance in its bearing on the rights, interests and feelings of a large portion of the community, as to have been made the subject of the fullest examination. The zeal, ability and research of the most eminent men of the bar and of the church have been enlisted in its discussion. No fact or argument that could elucidate the subject remains to be stated or urged. Not only so, but the question has been decided by the Supreme court of Kentucky and by the Supreme court of the United States, upon such mature deliberation and with such unanimity, in each case, as to leave but little room for hesitating as to the propriety of regarding the question as settled. In each case the validity of the plan of separation was sustained. Smith v. Swormstedt, 16 How. U. S. R. 288 ; Gibson v. Armstrong, 7 B. Monr. R. 481.
*325 I deem it necessary to say but little more than that I concur in these decisions. I have not been able to perceive on what ground it is to be maintained the general conference of 1844 was not invested with as full powers over the subject as any general conference that preceded it. The six restrictive articles adopted by the conference of 1808 and by succeeding conferences manifestly contain no limitation of power that can bear on the question. The ministers and preachers in whom i’esided the supreme power, had, when they assembled in 1784 to frame a government for the church, full power to place it under one or two or a still greater number of general oi’ganizations, if they had believed that the interests of the church would be thereby promoted. And I do not see how it can be said that the general conferences of 1792, 1796, 1800, 1804 and 1808, composed as they were of the body of the ministers and preachers, did not each have the same power. And when they determined at the last mentioned conference (1808) to meet no longer en masse, but thereafter, by a delegation from their own body, the provision, which they adopted, that the general conference should have full powers to make rules and regulations for the church, under the limitations and restrictions contained in the six restrictive articles just mentioned, amounted in substance to an authority to the delegates in conference thereafter to exercise all the powers (except those prohibited in said restrictive articles) that could at any time have been exercised by a full conference of all the ministers and preachers. No further limitation on the powers of the general conference having been subsequently made, it seems to me that the conference of 1844 was clothed with the power which it claimed and exercised.
The Baltimore conference sent no delegates to the Louisville convention, and in 1846 adopted resolutions *326 declaring that they still regarded themselves a constituent part of the Methodist Episcopal church in the United States. By virtue of this action of said conference, the society at Salem church being within the limits of that conference, would have been left to stand in connection with the northern division of the church, as they stood before the division of the church; and the appellants, under the influence of the principles which I have endeavored to establish, would thus have been entitled, though a minority, to prevail in this controversy were it not for the provision in the first resolution of the plan of separation, by which the border societies have a right, by vote of a majority of its members, to choose to which j urisdictional division of the church they will belong. The members of Salem church, at a meeting which seems to have been fairly conducted, have determined, by a majority vote, to adhere to the church south.
A still further question, however, remains to be settled, viz : Whether this is a border society ? The boundaries of the annual conferences have been from time to time fixed by the general conference, but no boundaries have been fixed for the societies, stations and circuits. In this state of things, it is obvious that in some cases it may be extremely difficult, if not impracticable, to carry out the plan of separation. It is next to impossible to lay down any general rule by which to define a border society. In some cases, however, as in the case of the Maysville Church, in 7 B. Monr. R. 481, and in the case of Clift Church, (which was argued with this,) the proximity of the houses of worship to a common .boundary of two conferences was so close that no question seems to have arisen as to the claim of the societies to be regarded as border societies, in the meaning of the resolutions.
One of the witnesses expresses the belief that Salem society is not a border society, and that a portion of *327 Warrenton circuit is interposed between it and the Rappahannock river, which is the common boundary of the Virginia and Baltimore conferences. But five or six other witnesses express the belief that Salem is a border society, and that no portion of the country between the church and the river is attached to the Warrenton circuit. The weight of this testimony is in favor of the proposition that it is a border society; and upon a question of the kind the conduct of the parties interested, as showing how they have regarded the matter, is entitled to much weight. The minority, by going into a vote on the question, have treated it as one on which a vote might be properly taken; which would not be the case on any other hypothesis than that of the society’s being a border society. And it seems to me, therefore, that this conduct of the parties, taken in connection with the other proofs in the cause, justifies us in treating this as a border society.
By the vote of a majority, the society has been placed, in the manner contemplated and allowed by the plan of separation, in jurisdictional connection with the ecclesiastical government of the Methodist Episcopal church south; which, by virtue of its organization under said plan, is now the lawful successor of the Methodist Episcopal church in respect to the disciplinary control and protection of the members of the church adhering to the southern division. And such members have now the same right to enjoy the church property which was held by their societies before the division, in exclusion of those who repudiate the authority of the Methodist Episcopal church south, and refuse to receive the pastors appointed by it, that they had, before the division and whilst in connection with the Methodist Episcopal church, to enjoy said property in exclusion of any who might have refused *328 to submit to the discipline and to receive the preachers of said last mentioned church.
Such being the views which I have taken of the case, it seems to me that the decree of the Circuit court is erroneous, and ought to be reversed, and that the bill should be dismissed.
Lee and Samuels, Js. concurred in the results of the opinion of Daniel, J. but not in the views or reasoning.
Allen, P. and Moncure, J. concurred in the opinion.
Decree reversed.