Burks, J.,
delivered the opinion of the court.
The controversy in these cases relates to church property. In the one case, the right to the use of a building as a house of public worship is the matter in dispute; in the other, the right to the use of a parsonage or residence *431 for a minister: both pieces of property situated in the county of Loudoun. The respective claimants belong to separate and distinct religious organizations. On the side, they are members of the Methodist Episcopal Church, on the other, members of the Methodist Episcopal Church South.
I propose to consider the case in relation to the church building first. This building was erected as a house of public worship, pursuant to the provisions of the deed of December 30, 1833, from Taverner and wife to the trustees therein named, on the land thereby conveyed, situate within the territorial limits of the Baltimore conference of the Methodist Episcopal Church South.
The deed is the same in substance as the deed in Brooke & others v. Shacklett, 13 Gratt. 301, and the construction must be the same. According to that construction, the conveyance is not for the use of the Methodist Episcopal Church in a general sense. Such a conveyance in this state would be void. But it is a conveyance for the use of a particular congregation of that church, in the limited and local sense of the term—that is, for the members, as such, of the congregation of the Methodist Episcopal Church, who, from their residence at or near the place of public worship, may be expected to use it for that purpose. Such a conveyance is valid under our statutes. See Code of 1873, ch. 76, § 8.
Who, then, are the cestuis que trust under the deed in question, the beneficiaries entitled to the control and use of the “Harmony” church building? Looking to the deed alone, the answer would be, those who are members of the congregation or local society, and, as such, members of the Methodist Episcopal Church. According to the test applied in Den v. Bolton, 7 Halst. (N. J.) 215, cited with approbation in the opinion of Judge Daniel in Brooke & others v. Shaoklett, supra, “ to constitute a member of any church, two points at least are essential, without mean- *432 to Sa^ that ot^ers are nol} so> a profession of its faith and a submission to its govern ment.’:
Although a question is raised in the record as to the memhership of the appellees, the evidence satisfies me that they are, and some of them have been for many years, members of the Methodist Episcopal Church. Their names are on the church records as members, and although their attendance on public worship appears to have been, at one time, interrupted from causes incident to the war, they never ceased to be members of the church. They profess its faith, receive the pastors assigned by it, and submit to its discipline and government. On the other hand, it is not pretended that the appellants, and those they represent, are members of that church. They neither recognize its authority, nor submit to its government, but deny and resist both. The proof is clear, and the fact is not disputed, that they are and claim to be members of another and distinct organization, the Methodist Episcopal Church South, recognizing its authority, submitting to its government, and asserting for themselves, and the ministers assigned by this church, a claim to the exclusive use of the church building.
The grounds on which this claim is rested will be better understood after a brief statement of facts deduced from the record.
The Baltimore conference was not represented in the convention held in Louisville, Kentucky, in May, 1845, which organized the Methodist Episcopal Church South, and being a border conference, under the plan of separation agreed upon by the general conference of the Methodist Episcopal Church in 1844, it had the right to determine for itself its future ecclesiastical relations by electing to continue its connection with the old organization, or attach itself to the new. Accordingly, at its first annual session after the convention at Louisville—to wit: in the year 1846—it adopted the following resolution:
*433 “ Resolved, 1. By the Baltimore annual conference in 'conference assembled, that we still continue to regard ourselves a constituent part of the Methodist Episcopal Church in the United States.”
At the same time, another resolution was adopted, in the following words:
“ Resolved, 2. That this conference disclaims any fellowship with abolitionism; on the contrary, while it is determined to maintain its well known and long established position by keeping the traveling preachers composing its ■own body free from slavery, it is also determined not to hold connection with any ecclesiastical body that shall make non-slaveholding a condition of membership in the •church, but to stand by and maintain the discipline as it is.”
The journal of this conference, containing these proceedings, it seems was submitted, according to the requirements of the discipline, to the next general conference of the Methodist Episcopal Church, and was approved, it is claimed, or at least no objection was made to the proceedings referred to.
The Baltimore conference continued its connection with the general conference of the Methodist Episcopal Church until the annual conference held at Staunton in March, 1861, when, in consequence of the incorporation in the discipline by the general conference at Buffalo, in May, 1860, of what is called the “New Chapter” on slavery, the following resolution, among others, was adopted :
“ Be it resolved by the Baltimore annual conference in conference assembled, that we hereby declare that the general conference of the M. E. Church, held at Buffalo, in May, 1860, by its unconstitutional action, has sundered the ecclesiastical relation which has hitherto bound us together as one church, as far as any act of theirs could do so. That we will .not longer submit to the jurisdiction of said general conference, but hereby declare our *434 se^ves seParate and independent of it, still claiming to be, notwithstanding, an integral part of the M. E. Church.”
This resolution was adopted by a very large majority of the members of the conference. Of the votes cast, only one , , . being in the negative, the other members, disapproving the action of conference, not voting.
The new and independent position thus assumed by the majority of the members of the Baltimore conference was continued for several years. They held annual conferences during the war at different places in Virginia under the name and style of the “Baltimore annual conference”; and at an annual conference of this body, held in Alexandria in February, 1866, it was resolved to unite with and adhere to the Methodist Episcopal Church South.
In the meantime, the members'of the conference held at Staunton in 1861, who disapproved the action taken by the majority there as without authority and of no binding force, adhering to the old organization of the Methodist Episcopal Church, and claiming to be the lawful Baltimore annual conference, held an annual conference at Baltimore in 1862, and annual conferences successively thereafter, being represented in the general conferences of the Methodist Episcopal Church wherever held, and recognized by that body as the duly constituted Baltimore annual conference.
After the action of the conference at Alexandria, precisely when does not appear from the record, a vote was taken by the members of the congregation worshiping at “Harmony” church, on the question whether they would unite with the Methodist Episcopal Church South, and the vote was unanimous in favor of such union; but it appears that none of the members who adhered to the Methodist Episcopal Church were present when this vote was taken, or, if any -were present, they did not vote.
After this action, it' would seem, by the members of the congregation, or rather the greater part of them, on appli *435 cation to the circuit court of Loudoun county, the appellants and others were appointed trustees of “ Harmony ” church, and, it seems, they at once took control of church building, admitting to the use thereof the ministers assigned by the conferences of the Methodist Episcopal Church South, and excluding from such use those assigned by the conferences of the Methodist Episcopal Church. This admission of one class of preachers and exclusion of the other continued until 1871, when the appellees filed their bill in this case for relief.
The appellants base their claim thus to control and apply the use of the building on several grounds.
1. They claim that the plan of separation agreed upon by the general conference of the Methodist Episcopal Church in 1844 was within the scope of the powers of that body, and therefore valid; that the action of the Baltimore conference at Baltimore in 1846, at Staunton in 1861, and of the conference at Alexandria in 1866, was, in each instance, authorized by that plan ; that the Baltimore conference, being a border conference, had the right, under the plan, to annex a condition to the continuance of its connection with the general conference of the Methodist Episcopal Church; that in 1846'it did annex such condition, with the acquiescence, if not approval, of the general conference; that this condition was broken by the general conference in 1860, and the Baltimore Conference was thus left free to dissolve its connection, as it did, with the general conference, and unite itself with the Methodist Episcopal Church South.
It was decided by this court in Brooke & others v. Shacklett, supra, that the plan of separation, as also the actual separation under the plan, and the organization of the church in the south, were all valid acts. Like decisions have been made by the supreme court of the United States and the appellate tribunals of other states.
The error of the appellants consists, I think, in the as *436 sumption that under the plan of separation the border conferences were to be at liberty to impose terms and conditions in declaring their adherence to the old organization, and in the further assumption that the Baltimore conference, in the resolutions adopted in 1846, made the continuance of its connection with the general conference dependent on conditions which were accepted by the latter, the non-observance or breach of which conditions should authorize the Baltimore conference to terminate the connection and unite itself with the Church South.
I find nothing in the plan devised in 1844 giving countenance to the idea that after the contemplated separation had been carried into effect, a border conference should have the right to do more than merely make choice between the two churches—either to continue its connection with the church north, or attach itself to the church south. After the southern conferences had organized themselves as a separate and distinct ecclesiastical body, it could hardly have been designed by the general conference of the Methodist Episcopal Church to sanction and provide for a further disintegration to take place in some emergency that might arise in the indefinite future. The object was a peaceful, speedy, and permanent settlement of the pending difficulties. This object would have been defeated, partially at least, if the general conference had allowed the border conferences, in electing to continue their ecclesiastical connection, to make the continuance of such connection dependent on future contingencies. As before stated, the Baltimore conference was not represented in the convention of delegates from the southern conferences at Louisville in 1845. The action of that convention did not change the existing relation of the Baltimore conference to the general conference of the Methodist Episcopal Church. It left the Baltimore conference in full connection with that general conference, with the right to dissolve that connection, if it chose to do so, and adhere to *437 the Methodist Episcopal Church South. Unless, therefore, the Baltimore conference meant to adhere to the southern division, no action at all on its part would seem to have been necessary. Having determined not to change its ecclesiastical relations, the resolutions adopted were unnecessary. This would seem to be the fair construction of the resolutions of 1844, which looked to action of such only of the border conferences, stations, and societies, as desired to adhere to the church south. "When the Baltimore conference in 1846, declared that it still regarded itself “a, constituent part of the Methodist Episcopal Church in the United States,” it only announced what would have been the result in any event, if no such declaration had been made. The resolutions did not put it in any new relation to the general conference, with which it stood already connected. The declaration, that it was “ determined not to hold connection with any ecclesiastical body that shall make non-slaveholding a condition of memberbership in the church, but to stand by and maintain the discipline as it is,” was in substance the declaration of a purpose to dissolve the existing relation in certain contingencies which might arise in the future. Such declaration added no new term to the existing union between the two conferences, and must have been so understood by both. It might have been made as well before as after the separation of the churches in 1845. The effect would have been the same.
The subsequent conduct of the Baltimore conference shows, that it did not regard its action in 1846 as modifying its pre-existing relation to the general conference and as deferring its choice of ecclesiastical relations under the plan of 1844, to be exercised in accordance with that plan on the happening of a contingency in the future. The action at Staunton in 1861, after the lapse of fifteen years from the adoption of the resolutions in Baltimore, was not based on any claim of right under the plan of separation *438 devised in 1844, but, as has been seen, in the alleged “unconstitutional action” of the general conference at Buffalo, ■in May, 1860. As, in the view I take, there was no new condition imposed by the action of the Baltimore conference in 1846, it is unnecessary to consider the action of the general conference in May, 1860.
So, as it seems to me, the first position taken by the appellants in support of their claim, cannot be maintained.
2. But it is further contended, that independently of the action at Staunton in March, 1861, the war which ensued ipso facto dissolved and put an end to all ecclesiastical connections between the people of the northern and southern states, and that the congregation of “ Harmony ” church was left free to form new church relations, and that the property rights of the congregation followed these relations.
I do not think the war, resulting as it did, had any such effect. One of the consequences was a suspension during hostilities of all intercourse between citizens not subject to the dominion of the same belligerent party. Between such citizens, also, while all legal remedies on existing contracts and obligations were suspended, yet the contracts and obligations themselves, as a general rule, were not abrogated, but continued in force after the war terminated. The property rights of the members of the Methodist Episcopal church worshiping or entitled to worship at the Harmony church building were not extinguished or impaired by the war. They were the same at the close of the war and afterwards as at and before its commencement, and the test by which the title to the use of the building is to be determined remains the same. The congregation, although within the territorial limits of the Baltimore conference, which was a border conference, was not a “border society,” within the meaning of the resolutions of 1844, as was the case in Brooke & others v. Shacklett, and *439 hence had no authority under these resolutions to deter- . -i, mine by a majority of its members its adherence to the church south.
3. It is also insisted that the action of the congregation of "Harmony” church, after the conference at Alexandria held in 1866, operated to transfer the title and control of the property to that portion of the congregation which adhered to the Methodist Episcopal Church South. That action has already been adverted to, and is claimed to have been had under an act of the general assembly, passed February 18th, 1867 (acts of 1866-7, ch. 210, pp. 649, 650; Code of 1873, ch. 76, §9), which had the effect, as contended, to transfer the control and use of the property as aforesaid. It is not clear, from the evidence, whether this action of the congregation was had before or after the passage of the act referred to. I should rather infer that it was in 1866, before the act was passed. If that were so, of course there would be nothing in the point made by the appellants on the operation of the act. But suppose it was after the passage of the act. It is a sufficient answer to the claim of the appellants based on this statute, that it does not appear by the record that the provisions of the statute have been fully complied with. The portion bearing on this case reads as follows: "And whereas divisions have occurred in some churches or religious societies to which such religious congregations have been attached, and such divisions may hereafter occur, it shall, in any such case, be lawful for the communicants and pewholders over twenty-one years of age, by a vote of a majority of the whole number, as soon as practicable after the passage of this act, or whenever such division shall occur, to determine to which branch of the church or soeietysuch congregation shall thereafter belong; and which determination shall be reported to the said court, and, if approved, shall be so-entered on the minutes, and shall be conclusive as to the title to and control of any property held in trust for *440 suc^ congregaOon, and shall be respected and enforced accordingly in all the courts of this commonwealth.”
A vote of the members of the congregation was taken some time, as already stated, but there is no evidence . . that the determination of the congregation manifested by vote was reported to the circuit court of Loudoun county, approved by that court, and so entered on its minates. Compliance with these requirements is essential to-the effect given by the statute. It seems, from the certificate of the judge, that he had before him as evidence in this cause, when he rendered the decree appealed from, the record of the appointment of the trustees, but that record is not before us, and it is not essential that it should be, in order to show the appointment of the trustees, as the appointment is not controverted.
It is to be observed, further, that the claim of title? based on proceedings under the statute, is not made by the appellants in their answer to the bill. It should have been so made, if intended to be relied on.
If this had been done, and the provisions of the statute had been complied with in every particular, the question would have been presented, whether the act does not encroach upon vested rights in putting it in the power of a majority of the members of the congregation to shift the title and use of the property without the consent and against the will of the minority; and the further question, how the operation of the statute is affected, if at all, by the provision of the state constitution on “church property,” art. II.
These are questions of interest and great practical importance. It is not necessáry, however, to decide them in this case, as it is presented by the record, and I express no-opinion upon them.
4. After the appeal had been allowed in this case, the appellants filed a supplemental petition alleging that a joint commission, appointed by the general conferences, in *441 vested with the power and charged with the duty of hearing and adjudicating cases in which there were adverse claims to church property on the part of the two churches, had, at Cape May, in New Jersey, on the 21st day of August, 1876, and while this case was pending here on appeal, adjudicated the claim in the case in favor of the Methodist Episcopal Church South (what is represented as the original written adjudication being filed with the petition), and the prayer is, that this court will take notice of the adjudication and give effect to it.
While the Christian spirit that prompted the appointment of this joint commission cannot be too highly commended, there is one reason all-sufficient why the prayer of the petition cannot be granted. The court is asked to pass on matters not in the record, and which, in fact, have arisen since the appeal was allowed. No issues have been made on the supplemental petition, and we cannot assume facts which are neither admitted nor proved. Moreover, this court, exercising appellate jurisdiction, cannot take original cognizance of matters which have never been litigated by the parties in the court below. If the petitioners have any remedy touching these matters, it is in that forum in the first instance, not in this, and they will not be precluded from resorting to it by the decree which will be entered here.
The objection that the appellees are not members of the congregation, and therefore cannot maintain this suit, is answered by what has been said in the first part of this opinion.
One other objection only remains to be noticed.
Is seems that several of the appellants, while acting as trustees of the church building before the war, and when their authority was not questioned, advanced money for repairing the building, and on a bill filed for the purpose in the county court of Loudoun, a decree was rendered in *442 their behalf, ordering the building to be sold to pay for the advances, which decree has never been executed.
They now complain that this decree has been disregarded by the circuit court and their rights prejudiced thereby.
The record in the county court was before the judge of the circuit court when he rendered his decree, and it is a part of the record now before this court. In his decree he does not notice the decree of the county court, nor specifically the claim of the appellants for their alleged advances, which claim is set up in their answer to the bill, and proofs were taken in support of it. But I do not regard the decree of the circuit court as rejecting the claim for the alleged advances. On the contrary, an account is ordered to ascertain the value of the use and profits of the building, and “of the improvements made by the defendants.” I apprehend, in taking the account ordered, if, for any reason, the decree of the county court should not be executed, the claim for advances may be brought in. A lien is expressly given by the terms of the deed to the trustees making advances for repairs, and in the case of Lynn, trustee, v. Carson’s adm’r, decided by this court recently at Staunton, (supra 170), it was held that trustees of a church building for the use of a congregation of members of the Methodist church, making advances for repairing the building, have a lien, under the discipline of the church, on the building for such advances; which lien may be enforced in a court of equity.
The views presented on the main points in the case, which has been considered, apply as well to the case touching the parsonage property, and need not be repeated. If those views are sound, there is only one question of any difficulty in the latter case, and that grows out of the trusts declared in the deed of conveyance to the trustees. The trusts are rather more indefinite than those declared in the deed in the other case, and at first view appear too vague to be brought within the operation of our statutes *443 authorizing conveyances to the use of religious congregations. But a careful examination of the provisions of the deed, in connection with the discipline to which it refers, warrants, I think, the construction that the uses created are for the congregations or local societies within the circuit in which the building is located. This would seem to be indicated by the reference in one case to “the duty of the minister or preacher in charge’’ which must mean the minister in charge of the circuit and the congregations or local societies within that circuit. So the trustees are authorized to sell the property for advances made by them, “after due notice to the preacher in charge’’ and, after paying the debt or debts, to “place the remainder of the proceeds of sale, if any, in the hands of the stewards of the church,” &c.; the stewards being officers in the local societies. I think, upon the principles applied in Brooke & others v. Shacklett, the deed should receive a liberal construction, with the view to give effect to the trusts; and, although quite general in its terms, I am of opinion that it is a valid conveyance under our statute.
Objection is made that the complainants in the bill had no legal or equitable interest in the subject, and therefore could not maintain the suit. They were the preachers, duly assigned to the circuit, and had the right, under the deed, to be admitted to the use of the parsonage building through the medium of the trustees and the congregation. The bill is filed, not only on their behalf, but also on behalf of the congregation interested in the building, and such a bill, I think, may well be maintained.
In conclusion, it is urged that John R. White, one of the trustees, not being a parly to the suit, the decree, for that reason, should be reversed. There was a demurrer to the bill for want of equity, and the fact that White was a trustee, and not a party, is stated in the answer of the appellants, but they did not ask that he should be made a party. All of the other trustees were parties, and made *444 fa]l defence. It is not perceived how they or those they 1 . J J represented could have been either benefited by White’s or prejudiced by his absence. He cannot be deemed an indispensable party for the purposes of the suit,, when it is apparent that every defence he could have made mi'ght have been made and was made by his co-trustees.
Upon the whole matter in both cases, I am of opinion that there is no error in either of the decrees of the circuit, court, and that they should be severally affirmed, without prejudice, however, to any rights and remedies to which the appellants and those they represent may be entitled under the action of the joint commission aforesaid.
I will only add, that it is matter of regret, that there-should ever be a necessity for bringing controversies between religious bodies to the civil courts for decision. They are pre-eminently proper subjects for private adjustment, and this court therefore deemed it not improper, after these causes were submitted, to delay its decision awhile, indulging the hope, reasonably, we think, that the parties themselves would, in the meantime, come to some terms of settlement, so as to render a decision by this court unnecessary. After this delay, receiving assurance that no-adjustment would or could be made by the parties, the-court, in the exercise of it§ only proper functions, has proceeded to dispose of the cases on legal principles.
Decree affirmed.