Scott, J.
The record in this case presents for our decision, but a single question; and that lies within the narrow limits of a short letter of attorney constituting an agent with authority to sign the names of his principals, as endorsers on certain bills and notes to be thereafter drawn by a third person.
A wide range has been taken by the learned counsel on both sides, in the discussion of this question, leaving nothing unsaid which can be said on either side.
I do not deem it necessary to follow them step by step; nor to go into a minute analysis of the cases cited to enforce, or illustrate those rules of construction which are to serve as our guides. I will content myself with stating the principles deducible from such of them as apply to the question before us.
It is insisted by the counsel for the defendant in error, that all delegations of power must be strictly construed.
The object of construction in all cases, is to ascertain the intention of the parties, or more properly speaking, the meaning of the instrument: for we are bound to say that the parties intend, what the written instrument declares. It not unfrequenlly happens, that we have to settle the construction of a contract in regard to questions, which never occurred to the parties to it. And were we permitted to indulge in conjecture and probabilities, nothing is more probable than that the difference between one joint endorsement and several *264 successive endorsements, never occurred to the makers of this power of attorney. We shall best carry out their by construing their language neither strictly nor liberally, but fairly: and this, I apprehend is, in ge/'nera}, true rule. Some of the cases relied on by the defendant’s counsel, will be found on examination, rather to enforce a strict obedience to the mandate of tjie constituent, than any rigor of construction in ascertaining what that mandate is. On the other hand cases have been cited which decide, that when the words of a letter of attorney admit of two constructions, they shall, as in other grants, be construed most strongly against the grantor; that the grant of power to do a particular thing, carries with it the power to employ appropriate means; and where no particular mode is either prescribed, or forbidden, he may adopt any which does not disappoint some purpose of the grant. It is not necessary in this case, to reconcile any apparent discrepancy between the cases on this point. All agree that when the power, whether it be conferred in express terms, or by fair implication, is once ascertained, the agent cannot depart from it. He can neither go beside, nor beyond, nor fall short of it. He must do the very thing which he is empowered to do; and cannot substitute an equivalent. His power being an emanation from his constituent, exists only to the extent to which it is imparted. It is incorrect to say that, an agent may exercise his discretion where it is not restrained. What is called a restriction, is more properly an exception of that which would otherwise be granted, either in express, terms or by fair implication. Nor is it necessary that a reason should be given for the limits within which the agent is confined. The appointment is the voluntary act of the principal. He is under no obligation to repose confidence in another, or part with his power over his own property. His will, whether it be the result of sound judgment, or wild caprice, is law. Story on Agency, p. 85, §> 75.
*265 In construing all instruments, powers of attorney included, we are not at liberty to depart from the plain and obvious meaning of the words. They may nevertheless be restrained, or enlarged, by the subject matter. Words importing juncturel may be construed distributively: and vice versa. Cases which furnish examples of this exception to the common sense rule, which refers us to the words employed by the parties, as the exponents of their intentions, were cited in the argument. Slingsby’s case, 5 Coke’s R. 18 b.; Windham’s case, Id. 7 b.; James v. Emery, 2 Cond. Exch. 11. 290. The principle settled in these and other cases on the same subject, will be found in a note in 5 Coke’s R. 19 b.
“ Whenever the interest of the covenantees is joint, although the covenant is in terms joint and several, the action follows the nature of the interest, and must be brought in the names of all the covenantees. But where the interest of the covenantees is several, they may maintain separate actions, although the language of the covenant be joint.”
Keeping these principles in view, let us proceed to the case presented by the record.
[ The judge stated the facts and then proceeded.]
The legal effect of several successive endorsements is, that each endorser has a right to look for indemnity to all the endorsers who precede him, whether they endorse for accommodation of the drawer or for value received : unless there be an agreement aliunde, different from that evidenced by the endorsements. 5 Munf. 252; 4 Rand. 553. By a joint endorsement for accommodation of the drawer, all the endorsers are cosureties, bound to contribution: and if such an endorsement had been made in this case, Beirne would have a right, by virtue thereof, to call on the others to share the burden: unless there was an agreement, proved by evidence aliunde, that he should bear the whole, or more than an aliquot part. It cannot be questioned that it was com *266 petent for the parties to occupy the relation among themselves, of cosureties, and yet authorize their agent to endorse for them severally; for although such endorse-merits would be prima fade evidence of a different agreement, it would not be conclusive. It would, however, throw upon the endorser suing for contribution, the burden of proving a different contract, from that evi¿fenced by the endorsements. The task might, and in many cases would be a difficult one. In this case, the authority of the agent is in writing, and as will be hereafter shewn, furnishes the proof. But although found in the record in this case, it does not, necessarily, make part of the record in a suit on these endorsements. If the power was duly executed, the plaintiffs might recover on the count which charges Beirne as sole endorser, by his own hand; and he could not call for the production of the power of attorney. Under our statute he could file no plea which would call for that evidence, unless he swore to it; and that he could not do if he had authorized his attorney to make a several endorsement for him.
Supposing the parties to stand in the relation of co-sureties, as between themselves, there are several other considerations which would render a joint endorsement preferable to several successive endorsements. Upon a joint endorsement, it would be necessary for the bank to give notice to all the endorsers; a duty imposing a light burden upon the bank; requiring nothing more than common prudence would dictate for its own safety ; nothing more than a knowledge of the residence of those, on whose responsibility the draft was discounted; (a knowledge without which their responsibility would be unavailing;) and the labour of writing, and putting into the post office, a letter to each of them; (labour commonly performed by the notary;) whereas prompt notice of the dishonour of the draft might be of vital importance to the endorsers. All would be, instantly, set at work, for the benefit of each. So much importance *267 does the law attach to notice, that it requires of the holder the utmost diligence in giving it. Upon several endorsements, the bank, if it had been so minded, might have given notice to one only; and in this very case every count in the declaration avers notice to Beirne alone. And were such the fact, he was under no obligation to give notice to the others to entitle him to sue on an agreement for contribution. Such an agreement is not a mercantile contract, but is governed by the common law: and the party seeking to enforce it, is under no greater necessity of giving notice, than he would bo if the contract were in the form of a bond of indemnity. The party charged, is entitled to no notice, but that which is furnished by the contract itself: so that the first notice of the demand, might be the suit to enforce it.
Upon a joint endorsement, all must be sued; and although under our statute, judgment might be given against one only, or if against all, the goods of one might be taken in execution, yet each would stand an equal chance of escape. Upon several endorsements one might be selected as the first victim; as has been done in this case. A judgment against all would bind the lands of all; and if one paid the debt, he would be entitled to the benefit of the lien. In a suit for contribution, a joint endorsement would be evidence for the plaintiff; several endorsements would be evidence against him. Upon several endorsements, the one who is sued would have to litigate questions with the bank ; and being unsuccessful, would have to change sides, and litigate them over again with the others; and might be unsuccessful in both instances. In this very case, had the judgment below been against the defendant, and affirmed by an equal division of this court, although conclusive upon Beirne, the whole question would be open in a suit brought by him against another endorser.
*268 In a joint suit, a judgment against all the defendants would be conclusive upon the questions in issue. There is, then, an essential, and material difference between joint, and several endorsements; even where the endorsers occupy inter se, the relation of cosureties; and if the power of the agent extend only to one, he cannot make the other.
In examining the question, whether the attorney in this case, was authorized to present the endorsers, to the bank, and to the world, as liable to each other, in the order in which their names appear upon the draft, it is important to ascertain their true relation. If it appears by the power of attorney, that they are responsible to each other, in the order in which their names are endorsed, it would be conclusive to shew the authority of the agent so to place them on the draft. General words which standing alone, would import a power to make a joint endorsement only, would be construed distributively in such a case. If, on the contrary, it appears by the power of attorney, that the parties to it intended to take a common risk, and share the burden equally, it will go far to shew that they did not intend to be held out to the world, in a different character. If Andrew Beirne did not intend to embark his fortune in the same bottom with John B. Sieenbergen, and sink or swim with him, it will go far to shew that he did not intend to peril his credit, by holding himself out to the bank, and to the world, as having encountered that hazard. If he did not intend to interpose himself as a shield for the protection of the other endorsers, it will go far to shew that he did not intend to authorize his, and their agent, to make a contract for him, which would prima fade subject him to that liability; and lay him under the necessity of extricating himself from it, by producing other evidence, which if the authority had been by parol, he might find it impossible to do.
*269 What then was the relation in which these endorsers stood to each other ? Have we any sure foundation on which to rest an answer to this important question ? and what is it? We have in this record, as I think, a certain and sure foundation on which we may safely rest a satisfactory answer; and that is the letter of attorney itself.
In order to constitute an agreement, it is not necessary that the parties should use words of contract, as “ we covenant,” i£ we promise,” ££ we agree.” It is sufficient if what they have done amounts in law to an agreement. It is not necessary, therefore, that we should find in this power of attorney, an agreement in so many words, that they would share equally any loss which the proposed endorsement of iSteenbergen’s paper might occasion. It is enough if it appears that the transaction to which they are parties, imposed that obligation.
When two or more persons are sureties for another, the law implies a promise from each to the other, to contribute equally towards any loss which may be occasioned thereby. If they become sureties by successive endorsements on mercantile paper, as that is a form of contract which in general binds the first to indemnify the second, the law presumes that they mean to stand as they have placed themselves. But if there was a previous communication between them, which resulted in an agreement to become endorsers for the accommodation of the drawer, the latter presumption is removed, and the original one restored. ££ Mutual liability arises from mutual agreement to become bound for accommodation, unexplained, or uncontradicted by other circumstances.” Love v. Wall, 1 Hawks’s R. 318. Upon turning to the power of attorney in this case, we find that it gives a history of the connection of the parties, and all that they have done touching this matter, from the first application of Steenbergen to them to become his endorsers, to the final act of signing, sealing, and *270 delivering the letter of attorney. The beginning, progress, and termination, of every thing, save the act of their agent, connected with the transaction.
There was not only the communication, which in the case cited from Hawks, was held sufficient evidence to be left to a jury, from which to infer a mutual agreement to become sureties, but the whole instrument speaks a language too plain to be misunderstood. They all speak together, and say 11 John B. Steenbergen hath applied to us Samuel Coffman,” &c. &c. “ to endorse” his paper; and “all have consented thereto.” The application was not made to one to endorse, and to the others to guarantee the paper thus drawn and endorsed, but uno Jlatu to all to “endorse.” The answer was not, if one would agree to indemnify the rest they would endorse after him, much less did they marshal the whole line, but all with one united voice “consented.” They all embarked at the same instant, in the same enterprise, not in single file, but shoulder to shoulder. I consider it clear, therefore, that as between themselves, they intended perfect equality.
Having thus agreed to unite their fortunes in support of their friend, and the time and place, when and where resolves were to become action, making it inconvenient to act in person, they select an agent to act for them. To do what for them ? That thing which they had determined upon? Qr another and a different thing ? Having agreed to unite themselves, and share equally, a common danger, did they authorize their agent to sever them, and place one in front, and another in the rear ? This they might unquestionably do. The question is, have they done it ? Let the power of attorney answer. After reciting the request of Steenbergen, and their answer, it proceeds thus, “ Now therefore know ye that all whose names are herein before written, have made, ordained, constituted, and appointed, and by these presents do make” &c. &c. There is nothing here which *271 imports a severance of their union. All unite in the delegation of authority. I deem it unnecessary to discuss the question, on which the counsel on both sides exercised their ingenuity, whether this can with technical propriety, be called a joint grant. It is sufficient for my purpose, that the persons making it, acted collectively. The power conferred, if it existed in separate particles prior to the grant, united in the grantee, and formed a unit. It constituted him, not the attorney of each of the grantors separately, but the attorney of all collectively. The grantors all speak together, and say “ we appoint,” “ our attorney.” When the attorney speaks he is the mouth piece of all, when he writes he is the hand of all, when he signs the name of one he does it by authority of all. There is nothing, then, in the relation of the attorney to his constituents, which severs the original union of the latter. What do they authorize him to do ? “ Por us, and in our names, and our behalf, to sign our names as endorsers.” There is nothing in the words employed to define the thing to be done, which imports a severance of that unity which pervades the rest of the instrument. What he does is to he done in the names of all, and for and on behalf of all. Does the thing itself sever that unity ? He is to sign their names as endorsers. He cannot do this by a single stroke of the pen. He must write the name of one, before he can write the name of another. The name of one must, therefore, stand before the name of the others, whether written in a perpendicular, or horizontal line; and this is all that results of necessity, from the nature of the act to be done. He may so sign as that the signing shall be in the names of all, and for and on behalf of all jointly. He may so sign as to carry out the whole purpose of his constituents, to wit, to sustain the credit of Steenbergen, and share the risk equally.
But he is to sign their names as endorsers on all notes, bills, and drafts, drawn by Steenbergen, and it is sup *272 posed that a bill or note made payable to one, cannot be jointly endorsed by him and others; and the bill in this case being made payable to Beirne, the attorney could not make a joint endorsement of, and for Beirne and his other constituents; and, therefore, the words “ all bills” cannot be satisfied, unless the attorney is authorized to make successive endorsements. Be it so. The question -g whether the words “ all bills” shall control all the other words of the instrument, which import united action and common liability, and authorize the agent to defeat some of the leading purposes of his constituents, to wit, prompt notice to all, and perfect equality amongst themselves, when the other object of his agency, to wit, the accommodation of >Steenbergen, does not require it. It is just as easy to draw a bill payable to all as to one, and precisely the same labour to endorse one as the other. The bank would just as soon discount it in the one form as in the other. Why should it not ? Bills payable to two or more payees, who are not partners, are as well known to the law as any others. True no such bills have ever, as far as we are informed, been presented to this bank for discount. As none have been presented none have been refused. There can be no usage of the bank which rejects them. Nor are we informed of any by-law, rule, or resolution of the stockholders, directors, or any officer of the bank, which repels or discourages them. All that we know, is that none such have been offered within the memory of one of the discount clerks. Why, I again ask, should the bank reject them ? Because notice must be given to all who unite in a joint endorsement ? The more names upon the paper the better the security. To make them available all must have notice, whether payees or not. Any officer of this bank who would curtail the number of those who were willing to become liable for the large sum due by Steenbergen, to save himself the trouble of giving notice, or fail to give notice to all who were re *273 sponsible, whether first, second, or remote endorser, would deserve to lose his office. But a joint suit must be brought. And what is the trouble of that ? next to nothing. But let us return to the words of the letter of attorney. He is to endorse “ all bills,” but he is to make but one species of endorsement. He is to make an endorsement which will be in the names of all, and for and on behalf of all his constituents; and if a bill is presented to him on which he cannot make such an endorsement, he must either reject the bill, or vary the endorsement; and which shall he do ? Could he hesitate ? Change the form of your draft he would say to ISteenbergen, make it payable to your own order, or to bearer, or to all my constituents, or to a third person, and let him endorse it to them, without recourse if he so please, and then I will, for and on behalf of all my constituents, endorse their names upon it. The bank will as readily discount it in the one form as in the other, and thus the whole purpose of my agency will be accomplished. You will be accommodated, they will all have prompt notice if it shall be dishonoured; and equally divide the loss, if any shall arise. No one of them will have to meet the responsibility alone. All will be on a footing of perfect equality. The letter of attorney concludes by “ giving and granting full power and authority in and about the premises, for effecting the purpose hereby intended, as fully in all respects” as the parties themselves could do if personally present. Concede that this confirmatory clause, which, as a matter of course, makes part of every letter of attorney, is not in all cases idle repetition, mere verbiage, what are the “ premises” in regard to which, the purpose” for which this plenary power is conferred ? Why to give to ISteenbergen the united aid of these his friends, to sustain his credit at the Bank of the U. S. by pledging their united responsibility as endorsers on his paper; giving him credit, and placing them in a condition of *274 perfect equality ; and the agent has just as much authol'ity to disappoint one part of their purpose as another; just as much power to endorse other notes and drafts, to he discounted at another bank, as to destroy the equanty intended by his employers. I find nothing in the language of the instrument, nothing in its scope and purpose, nothing in the subject matter, nothing in the ugage 0f the bank, to warrant several and successive endorsements.
It is not necessary to say any thing in the case of the Farmers Bank v. Beirne. What is said in the other case, applies a fortiori to that. Both judgments must be affirmed.
The other judges concurred.