# CHARLESTON..

## CLARKE & Co. *et al.* v. FIGGINS *et al.*

Submitted January 18, 1886.—Decided February 20, 1886.

1. A suit cannot be removed from a State court to the circuit court of the United States, unless either all the parties on one side of the controversy are citizens of different States from those on the other side, or there is in such suit a separable controversy wholly between some of the parties who are citizens of different States, which can be fully determined as between them. (p. 667.)

2. Within the meaning of the removal act the word *resident* is not equivalent to the word *citizen*. (p. 669.)

3. A deed made by a debtor conveying the whole of his property to
a trustee, giving a reasonable time for the creditors to accept it,
and containing a provision, that all, who accept the deed, shall
thereby release their claims against the debtor, is not fraudulent
on its face.  (p. 669.)

4. Where a decision has been rendered in the State of Virginia and
followed in two other cases in Virginia before the separation, the
decisions will be followed by this Court without enquiring into
the grounds, on which said decisions are based.  (p. 670.)

5. A deed of trust requiring a release from creditors accepting it held
good on its face but fraudulent in fact, because the pleadings
and evidence showed, that the grantor was a merchant, and
within three months before the deed was executed he bought on
credit about $5,000.00 worth of goods and sold the goods for cash be-
low their market value, and when the deed was made he had only
about $2,000.00 worth of goods on hand and no accounts due
him for goods sold except $81.00, and admitted only $58.27 on
hand in cash, and made no explanation whatever showing how
he had disposed of the cash received for the goods.  (p. 673.)

*Payne & Green* and  *W. S. Laidley* for appellants.

*Simms & Enslow* for appellees.

JOHNSON, PRESIDENT:

This is an appeal from certain decrees of the circuit court
of Cabell county. J. W. Figgins was a merchant doing busi-
ness in said county, and on October 5, 1882, he made and exe-
cuted a deed to C. H. Neal, trustee, in which according to the
granting clause he " granted and conveyed   *   *   unto the
said C. H. Neal all his (the said J. W. Figgins's) property and
rights of property, real, personal and mixed, of every kind
and description, the same being enumerated and described as
far as remembered in the schedule hereto annexed, marked
' schedule A.' to have and to hold the said property and
rights of property aforesaid unto the said  C. H. Neal, his
heirs and assigns forever, in trust, &c."   The deed further
provided that the trustee out of the proceeds of said property
after paying costs and damages including a commission to
himself should " divide and pay the same to and among such
of his creditors, parties. hereto of the third part, who shall
execute and acknowledge this deed within thirty days from
the date hereof, in ratable proportion according to their re-

spective debts. A full list of all the creditors of the said J. W. Figgins, so far as now remembered, is contained in the ' schedule B,' hereto annexed. Then follows this provision :

" And it is further agreed by and between the said parties that the said respective creditors, parties hereto of the third part, in consideration of the assignments and promises and covenants hereinbefore made and entered into by and on the part of the said J. W. Figgins and for other good and valuable considerations them hereunto specially moving do, and each and every one of them for himself and themselves, severally and respectively, doth hereby take and accept the said hereinbefore assigned several promises, moneys, estates and effects in full payment, satisfaction and discharge of all their respective debts and demands, and they the said several creditors executing these presents, in further pursuance of this agreement, and for the several considerations aforesaid, have, and each and every of them hath, and by these presents severally and respectively do, and each of them doth, freely clearly and absolutely relinquish, exonerate, discharge and forever quitclaim unto the said J. W. Figgins each and every of their respective debts ; also all manner of action and actions, causes of action, suits at law and in equity, which they the said creditors executing these presents, or any or either of them now have, or ever had, or at any time hereafter can or may have claim or demand against him the said J. W. Figgins, for or by reason, or on account of their respective debts so due to them as aforesaid, or for or by reason or on occount of any other matter, claim, demand or cause whatsoever, antecedent to the day of the date of these presents."

This deed was executed by Figgins, Neal, the trustee, and the following creditors : Martin Threinan & Co., Thomas J. Duncan & Co., A. R. Clarke & Co., Towell & McFarland, Stern & Co., Rheinhart, Myer & Co., and S. W. Jameson & Co. The last of the above named creditors acknowledged said deed on November 1, 1882. On October 4, 1882, the day after the deed had been admitted to record, Ruffner Bros. sued out an attachment in the circuit court of Cabell county against the said Figgins, and bond having been given the officer was ordered to attach and take into his possession the goods of the defendant Figgins sufficient to pay $318.89 with interest and costs.

On the same day E. Kyle, sheriff of Cabell county, levied at 2:30 o'clock. P. M., the said attachment and took into his possession " all the goods of every kind and character in the room occupied by J. W. Figgins or his assignee in the town of Milton, West Virginia, as the property of J. W. Figgins," also on "one box containing cigars, marked J. W. Figgins, Milton ; also on two and a half boxes of tobacco in one package marked J. W. Figgins, Milton, as the property of J. W. Figgins, October 4, 1882, at 3·55 o'clock, P. M., at depot of Chesapeake & Ohio Railway Company at Milton."

On the same day Arnold & Abney sued out an attachment for $227.14, which was levied on the same property.

On October 5, 1882, Hurst, Purnell & Co. sued out an attachment for $596.00, which on that day was levied on the same property.

In November, 1882, the creditors, who had accepted the provisions of said deed of trust, filed their bill to have the property sold to pay their claims, and to have their liens declared prior to those of the attaching creditors, and prayed to have a receiver appointed to take charge of the goods, sell them, bring the proceeds into court and distribute them among the trust-lien-creditors.   On November 13 a receiver of the goods was appointed.   On March 12, 1883, he made his report, showing that he had sold the goods for $1,465.26, and that the expenses were $305.24 leaving a balance in his hands of $1,160.02.

The bill and amended bill both allege, that the assignment was of " all his (the assignors) stock of goods then in his store at Milton, W. Va."   The amended bill alleges, that the said goods "was all the property the said assignor owned."

Hurst, Purnell & Co. filed their petition and bond asking the removal of the cause into the court of the United States. On August 22, the court refused to order the removal of the cause.

On December 11, 1883, the defendants, Ruffner Bros., Arnold & Abney, Hurst, Purnell & Co. and Miller, Cissna & Co., demurred to the bill.   On March 21, 1884, Hurst, Purnell & Co. filed their answer, also the defendants Maddux Bros., Allemong, Baer & Co., John Dages & Co., H. N. Bailey,

Ruffner Bros. and Arnold & Abney, which answers were respectively replied to generally.

The answers claim, that the assignment is void on its face, and further that it is fraudulent in fact. The answer of Hurst, Purnell & Co. as well as some of the others avers, that Figgins did not include all his property in said trust; that a large amount of his property was secreted and spirited away; that he had a parlor organ and a large amount of household and kitchen property, which was not included; that before the assignment and within sixty days previous thereto he had purchased a large amount of goods from the plaintiffs and defendants, wherever he could get credit, aggregating over $6,000.00, and had sold these goods for cash, until he had reduced his stock to about $2,000.00, pocketed the money, and had not applied it to the payment of his debts, and turned over to the trustee only $59.00 in money, $81.00 in accounts, and about $2,000.00 in goods; that he had secreted a large amount of money, to-wit: $3,500.00, and withheld it from his trustee and still holds it from his creditors; that he had disposed of a large portion of his goods just previous to the assignment for less than cost, with the intent to defraud his creditors.

On December 4, 1884, the cause was heard on the pleadings, exhibits and depositions; and the court held the attachment-liens to be null and void as to the creditors who had accepted the provisions of the trust, and directed the receiver to pay the said creditors secured by the trust deed *pro rata.* The attaching creditors appealed.

The first question is as to the jurisdiction of the court below. Was the jurisdiction of that court ousted by the fact, that it was made to appear, that the cause was on the application of the petitioners, Hurst, Purnell & Co. removable to the circuit court of the United States? If it was, and the facts were made properly to appear, and a proper bond was filed, it was the duty of the circuit court to order the removal, otherwise its refusal to order such removal was right. The petition was filed alone by Hurst, Purnell & Co. It alleges that the amount in controversy exceeds $500.00 exclusive of costs; "that the controversy in said suit is between citizens of different States; that the plaintiff, A. R.

Clarke & Co., are not citizens of the State of West Virginia, but were at the commencement of this suit and are yet *residents* of another State, viz: the State of Ohio; that the petitioners are citizens of the State of Maryland; and that the defendants, J. W. Figgins, Ruffner Bros. and Arnold & Abney, are citizens of the State of West Virginia."

In the *Removal Cases*, 100 U. S. 457, it was held, that the statute meant, that, when the controversy, about which a suit in a State is brought, is between citizens of one or more States on one side and citizens of other States on the other side, either party to the controversy may remove the suit to the circuit court without regard to the position which they occupy in the pleadings as plaintiffs or defendants. For the purposes of removal the matter in dispute may be ascertained, and according to the facts the parties to the suit may be arranged on opposite sides of that dispute. If in such an arrangement it appears, that those on one side being all citizens of different States from those on the other desire a removal, the suit may be removed.

In *Blake* v. *McKim*, 103 U. S. 336, it appeared, that A., a citizen of Massachusetts, commenced a suit in a court of that State against the executors of B., two of whom were citizens of Massachusetts and one a citizen of New York, to enforce a liability of the testator. It was held, that the controversy not being divisible nor wholly between citizens of different States could not be removed.

In *Hyde* v. *Ruble*, 104 U. S. 407, it was decided that a suit cannot be removed from a State court to a circuit court of the United States, unless either all the parties on one side of the controversy are citizens of different States from those on the other side, or there is in such suit a separable controversy wholly between some of the parties who are citizens of different States, which can be fully determined as between them. The jurisdictional facts need not appear from the petition; but the facts set up in the petition should be such as, with what already appears on the record, to show that the suit is removable. *White* v. *Holt*, 20 W. Va. 792.

It is apparent, that the interest of none of the parties in the subject of controversy here is separable from that of the others. The parties arrayed against each other are A.

R. Clarke & Co., Towell & McFarland, Stern & Co., S. W. Jameson & Co., Thomas J. Duncan & Co., Reinhardt, Myer & Co., Theiman & Co., J. W. Figgins and C. H. Neal, the parties claiming under the trust, and the grantor and trustee on the one side, and Ruffner Bros., Arnold & Abney, Dages & Co., Hurst, Purnell & Co., Maddox Bros., Miller, Cessna & Co., and other attaching creditors and creditors who did not accept the trust. Now the petition and record do not show us of what States these different parties are citizens. The petitioners say that they themselves are citizens of Maryland, that A. R. Clarke & Co. are not citizens of West Virginia but are *residents* of Ohio, and that Figgins, Ruffner Bros. and Arnold & Abney are citizens of West Virginia. But Arnold & Abney and Ruffner Bros. are on the same side of the controversy with the petitioners, and they do not tell us of what State any of the other parties are citizens except Figgins, for the statement, that A. R. Clarke & Co. are *residents* of Ohio, is not equivalent to saying they are citizens of Ohio. The petition and record fail to show, that the cause is removable, and the court did not err in refusing to order its removal.

It is insisted, that the deed of trust was fraudulent on its face because of the provision, which required that those, who accepted the benefit of the deed, should receive their *pro rata* share thereunder in full discharge of their several claims. Whether such a deed proposing such a composition with the creditors of the grantor is valid or fraudulent, has been the subject of many contradictory decisions.

In *Skipwith* v. *Cunningham*, 8 Leigh 271, decided in 1837, it was held, that, when a debtor conveys his whole property to trustees upon trust to sell the same, and out of the net proceeds to pay certain preferred creditors, and then disburse the residue in paying *pro rata* all the just debts due from him to any other creditors, who should within four months release the debtor from further claim, is valid notwithstanding the provision for a release, and those embraced by its terms will have the benefit of the property in preference to a judgment-creditor. Tucker, president, in delivering the opinion of the whole court said:

"It is difficult indeed to imagine on what principle the

right of composition, by the assent of the creditors, can be contested, if the right of preference be conceded. He who gives up his all, and who in doing so has a right to pay one in exclusion of others, cannot be justly charged with fraud because he prefers those who humanely surrender all claim to his future labors. To set aside such preference as fraudulent, is to deny the right to prefer, which on all hands is conceded. Accordingly such agreements if executed are acknowledged to be valid and binding. *Heathcote* v. *Crookshanks*, 2 T. R. 24; *Lynn* v. *Bruce*, 2 H. Black. 317. But it is none the less true that if they are only part of the debtors property, the transaction is oppressive upon the creditors and fraudulent. A debtor is bound by duty to devote the whole of his property to the satisfaction of his creditors demands. 7 Pet. 614. He can have no right while he is full handed to extort from them a release on part of their just demands."

This case was followed in *Kevan* v. *Branch*, 1 Gratt. 274, *Phippu* v. *Durham*, 8 Gratt. 457, decided in 1852, and in *Gordon* v. *Cannon*, 18 Gratt. 387, decided in 1868. We are now asked by counsel for appellant to overthrow this long established doctrine first decided more than a quarter of a century before the separation and followed in two cases before that time and in another a few years thereafter. Kent in his Com. vol. 1. 475, says:

"A solemn decision upon a point of law arising in any given case becomes an authority in a like case, because it is the highest evidence, which we have, of the law applicable to the subject, and judges are bound to follow the decision so long as it stands unreversed; unless it can be shown that the law was misunderstood or misapplied in that particular case. If the decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness; and the community have a right to regard it, as a just declaration or exposition of the law, and to regulate their actions and contracts by it. It would therefore be extremely inconvenient to the public, if precedents were not duly regarded and implicitly followed. It is by the notoriety and stability of such rules that professional men can give safe advice to those who consult them, and people in general can venture with confidence to buy and trust and to deal

with each other. If judicial decisions were to be lightly disregarded we should disturb and unsettle the great landmarks of property. When a rule has once been deliberately adopted and declared, it ought not to be disturbed, unless by a court of appeal or review, and never by the same except for very cogent reasons and upon a clear manifestation of error."

In *Butler* v. *Duncomb*, 1 P. Wms. 452, the Lord Chancellor said :

" Though *Gerrard* and *Gerrard* and *Greaves* and *Maddison* were strong cases, yet this case seems to go yet farther ; and as Lord Chancellor Cowper declared, that if those cases had come before him he would not have gone so far, I for my part declare I'll not go a jot farther ; but where things are settled and rendered certain, it will not be so material how, as long as they are so, and that all people know how to act."

In *Cohens* v. *Virginia*, 6 Wheat. 399, Chief Justice Marshall said :

" The counsel for defendant in error urge in opposition to this rule of construction some *dicta* of the court in *Marbury* v. *Madison*. It is a maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit where the very point is presented for decision. The reason of the maxim is obvious. The question actually before the court, is investigated with care and considered in its full extent."

Mr. Kent tells us vol. 1, 476 :

"Throughout the whole period of the reign of Edward III to that of Henry VI the judges were incessantly urging the sacredness of precedents, and that a counsellor was not to be heard who spoke against them and that they ought to judge as the ancient sages taught. If we judge against former precedents said C. J. Prisot, it will be a bad example to the barristers and students at law, and they will not give any credit to the books or have any faith in them."

The courts have adhered to these principles with almost unwavering fidelity. In some instances they have been departed from ; but in those cases it has as a rule worked far

more harm than good. (*Emerson* v. *Atwater*, 7 Mich. 12; *Sparrow* v. *Kingman*, 1 N. Y. 260; *Reed* v. *Danby*, 44 Mo. 206; *Boon* v. *Bowers*, 30 Miss. 256; *Rockhill* v. *Nelson*, 24 Ind. 424; *Hihn* v. *Courtis*, 31 Cal. 402; *Lion* v. *Burtiss*, 20 Johns. 487.) The common law was only builded into a magnificent structure by the fathers laying a broad foundation, and the judges who followed them, being careful that every successive stone placed upon the foundation should not be different from those already laid. Thus we see harmony in the building throughout. If a different course had been pursued, and hasty and ill-advised decisions made without regard to the precedents, the common law instead of showing symmetry in its perfection would be one incongruous mass, and no one could form any idea how a matter would be decided, as in each case the judge would decide according to his own peculiar notion of what in that particular case might be right; and we know, that it is often true, that what one would consider right in the particular case another would regard as wrong. Nothing keeps a judge so srtictly in the line of his duty, as the feeling and constant realization of the fact, that he is bound by precedents. He knows, that his opinion will be by the legal profession with all its astuteness subjected to the severest criticism, and if he dares to depart on a given question from the well marked line of precedents, either his ability or integrity is in great danger of being impugned. There is too much clamor in this day to be governed less by precedents and to decide as each judge may think right in the particular case, and the reason given is, that the law as laid down by the precedents is uncertain. The only cause of its uncertainty is, that some courts in the hurry of business have rendered hasty decisions, without that consideration which ought to have been given to them, and perhaps have not cited a single authority, and then another judge or court in a great hurry has cited that case as an authority for another bad decision. It is only safe to know how the question has been settled, if settled at all, and then not depart from the rule; and if it has not been settled, to settle it after a thorough examination of the principles, upon which it must rest.

We can not now disturb the Virginia decisions. According to those decisions the deed of trust in this cause is not fraudulent on its face,

Is the deed fraudulent in fact ? It is charged to be so in the bill and denied in the answer. The bill charges, that a great deal of money and other property were not embraced in the deed nor turned over to the trustee. In *Quarles* v. *Kerr*, 14 Gratt. 54, Judge Samuels said :

" The owner can not divide his property into two parcels and protect himself in the enjoyment of the one by giving up the other ; he can not require his creditors to accept part and release for the residue. He may however surrender all his property to such creditors as will receive it in satisfaction of their debts and release the owner." In *Gordon* v. *Cannon*, 18 Gratt. 396, Moncure, P., in delivering the opinion of the court said : " In order to maintain the validity of such a deed, or at least that part of it which provides for the payment of debts on the terms of a release by the creditors, it is necessary that all, or substantially all the debtor's estate should be conveyed by the deed. * * The debtor is permitted by such arrangement to protect his future earnings from the pursuit of such of his creditors as may enter into it, but not a portion of his present property. He may protect his person indeed, by a fair composition and a surrender of all his property, but he can not protect a part of that property by giving up another part. Such an attempt is fraudulent and void." * * " But it is not necessary that the deed should show on its face that *all* the estate of the debtor is conveyed. That fact may be proved by evidence *aliunde*. In neither of the cases *Kevan et als.* v. *Branch et als.*, and *Phippen* v. *Durham et als.*, did it appear on the face of the deed that all of the property of the debtor was conveyed. In *Phippen* v. *Durham et als.* all of the debtor's property was not in fact conveyed, yet so nearly all as to bring the case within the operation of the rule. The amount omitted was too small to show that it was omitted for the purpose of securing any benefit to the debtor. The omission must have been from inadvertence. What invalidates a deed in such cases is, an intention to delay, hinder or defraud creditors, &c., and unless there be such an omission of property in the deed as shows such an intention it is not material. Any omission of property for the purpose of securing a substantial benefit to the debtor (except such property as may be ex-

empt by law, from distress or levy,) conclusively shows such an intention."

Neal, the trustee, to whom the possession of the property was transferred, in his deposition in answer to the question, "Did Mr. Figgins turn over to you all of his property of every kind and character?" said : "I don't know. He had household-goods at that time. He turned over everything that was in the store and never took anything out, while I had possession." In return to a writ of *certiorari* issued by the court at its own instance we now have before us schedules "A." and "B." referred to in the deed, also a part, not all, of the bills for goods purchased by Figgins, which bills are referred to in the deposition of the trustee, as showing the indebtedness to be $6,200.00. Schedule "A." is referred to in the deed as designating all the property owned by Figgins at the time the deed was made. The schedule is very brief and is as follows :

"Dry goods, groceries, notions, &c., boots and shoes, hats,
&c., jewelry, in store at Milton, W. Va., on day of assignment, supposed to be about...  .  $2,000 00
"Money on hand  .  .  .  . ..  .. ....  .. ..  .  .  58 27
"Open accounts about  . ... ... .... ..  . .  ...  81 00

"Total  .  ..  ...  ..  ... .. ... ..  .  ....  $2,139 27
                                                "J. W. FIGGINS."

What the household-goods amounted to we have no means of knowing. The deed professed to assign *all* the property of the grantor to the trustee ; and the schedule is the grantor's declaration of what he owned. It being shown that household-goods were withheld and also some unopened goods consigned to him, which were at the depot at Milton, and which the trustee says he never received, and all of which are omitted from the schedule, the burden was on Figgins to show, that the quantity or value of said goods was so small, that the grantor received no substantial benefit by the omission to include them. If he intended to reserve to himself the amount of property exempt from distress or levy, it was his duty to set out the articles and their value in his deed or schedule, so that the court could see, whether he was honest in his intent or the reverse. But to keep back from his creditors goods in bulk, without saying anything about them is *prima facie*

evidence of a fraudulent intent and not being rebutted by the other facts and circumstances in the case is conclusive evidence of the fraud, and the trustee had notice thereof.

But these are not all the facts and circumstances surrounding this transaction. It seems to me these additional facts and circumstances are entirely inconsistent with an honest purpose.

Figgins had been doing business in Milton only a few months; he turned over bills due to merchants, his trustee says, amounting to $6,200,00. The evidence shows, that he bought on credit and sold for cash or nearly so, as he only had due him in accounts about $81.00; that he sold the goods cheap, underselling the other merchants in the town; that he run his stock down to about $2,000.00; and when he made his assignment, declared he only had in his possession $58.27. The bills returned with the *certiorari* show a little less than $5,000.00; but schedule "B" shows enough more to amount to near $6,000.00. The oldest bill is dated April 28, 1882, $287.95; in May the bills before us amount to $397.87; in June to $1,278.73; in July to $366.09; in August to about $1,400.00; and in September to about $1,200.00. What had he done with all the cash received for these goods? He did not give his deposition. If the transaction had been honest, he could have explained it. The burden was on him to do it, because these facts and circumstances show a *prima facie* case of fraud entirely unrebutted by any evidence in the case. The conclusion to my mind is inevitable, that he broke up "full handed," that he had a large sum of money, which he concealed from his creditors. The trustee had notice of his indebtedness and of many of the circumstances surrounding the transaction and helped to conceal from creditors the fact, that the deed had not been recorded. When asked by the defendant, Abney, if the assignment had been recorded, he replied he thought it had; and, while the two were in conversation, some one came to Neal and told him his horse was ready, and he then rode to the court-house and had the deed recorded. Neal says in his deposition, that he arrived at the court-house about nine o'clock at night on the 3rd. of October, 1882. He says Figgins told him on the Friday preceding the assignment, that "his business was in such a

condition, that he would not be able to pay out, and some of his creditors would jump on him, and wanted him (Neal) to act as trustee." He further says : "After that he gave me the bills for the goods he had purchased. I reckoned up the bills; they amounted to about $6,200.00. I went to Barboursville with him on the following Sunday, which I think was the first of October. We went to Wm. Thompson, attorney, the next morning and had him write out the assignment."

Taking all these things together, I think we have a right to infer therefrom, that the trustee, Neal, had notice of the fraudulent intent of Figgins, when the deed was executed, if indeed in a case like this he was entitled to notice.

The decree must be reversed; but what shall be done with the case? Were it not for the fact, that a receiver had been appointed, who had sold the goods and brought the proceeds into court, we would here enter such a decree, as the circuit court of Cabell county should have rendered, and would dismiss the bill at the costs of the plaintiffs. But this we can not do, as the fund representing the goods is in the hands of the court. We will therefore reverse the decree at the costs of the appellees and remand the cause to the circuit court of Cabell county with instructions to hold said fund in its hands, until it shall be determined, to whom it should be paid, and then disburse it to those entitled thereto. We have held the deed void as to creditors, and therefore the fund can not go to the plaintiffs by virtue of the deed. Whether the attachments are valid or otherwise, will of course have to be settled in the attachment-cases. When the fund is distributed to those entitled thereto, the circuit court is further instructed to give costs in the circuit court against the plaintiffs up to the time the appeal was taken.

REVERSED.  REMANDED.