# CHARLESTON.

## WILSON *et al. v.* PERRY *et al.*

Submitted September 14, 1886—Decided November 20, 1886.

TRUSTS—PRESBYTERIAN CHURCH—COMMITTEE OF PUBLICATION.

A testator, before and at the time of his death, a member of the Presbyterian Church in the United States, having his domicil in Monroe county, W. Va., made to certain trustees the bequests hereinafter named upon the following trusts:

"$500.00 to fence the lot of ground, on which Mt. Pleasant Presbyterian Church stands, and the grave-yard belonging thereto;"

"$4,000.00 to purchase a parsonage for the use and benefit of the Mt. Pleasant Presbyterian Church forever;"

$250.00 to buy books for the library of the Presbyterian Sunday School at Union;"

"$250.00 to buy books for the library of the Sunday School at Centreville, Monroe county, W. Va.;"

$250.00 to establish a Sunday School at Fairview school house in Monroe co., W. Va., and provide the same with a library;"

"300.00 for the sole and exclusive use and purposes of the Home Missions of the Presbyterian Church in the United States;"

One-half of the residue of his estate for the use and benefit of the "Presbyterian Committee of Publication, at Richmond, Virginia:" and the other—

"Half of said residue—to be applied to the purchase of a parsonage for the use and benefit of the Presbyterian Church at Union, W. Va., forever."

At the time of the testator's death and for many years before, there was located in Richmond, Virginia, an agency instituted by the General Assembly of the "Presbyterian Church in the United States," called the "Executive Committee of Publication," consisting of *eleven* members of said church, charged with the duty of publishing and circulating its religious literature, who on the 8th of March, 1873, were incorporated by an act of the legislature of Virginia by the name and style of "The Trustees of the Presbyterian Committee of Publication," which had for its declared object "the dissemination of religious truth by means of the printing and circulation of books, tracts, papers, cards, &c., with power to acquire, receive, hold, invest, possess, enjoy, rent, sell, convey and otherwise manage and dispose of, as to them may seem most conducive to the interest and promotion of the Presbyterian Committee of Publication, all lands, money or other property real or per-

22

sonal, which may have been, or which may be given, or otherwise acquired for the use of said committee," which before and after its incorporation was as well known by the name of "The Presbyterian Committee of Publication," as by its corporate name.

In a suit brought by some of the heirs and distributees of the testator, against other of his distributees, and the trustees of said charitable bequests, and the said Presbyterian Committee of Publication to have said charitable bequests declared *null and void*, and for distribution of his estate. HELD:

I. CONSTITUTIONALITY OF VA. ACT OF MARCH 8, 1873, PRESBYTE-RIAN COMMITTEE OF PUBLICATION.

The said act of the legislature of Virginia, approved March 8, 1873, incorporating the individuals composing the "Executive Committee of Publication," commonly called the "Presbyterian Committee of Publication" by the name and style of "The Trustees of the Presbyterian Committee of Publication," was not an evasion or in violation of Section 17 of Article V of the Constitution of Virginia.

II. PUBLIC POLICY.

Neither the said act of the Legislature of Virginia, nor the objects and purposes of the corporation thereby created were hostile to the public policy of Virginia as manifested by her current legislation; nor are the same in any degree hostile to the public policy of this State.

III. POWERS—TO HOLD REAL ESTATE—LIMIT.

Said corporation has the legal capacity to take and hold real and personal property by devise or bequest from a testator in this State for its general objects and purposes as defined by the terms of its charter, *provided* the amounts so devised or bequeathed to it, do not increase the amount of property held by it to a sum exceeding $200,000.00.

IV. WILLS—CONSTRUCTION—UNCERTAINTY AS TO OBJECTS—EV-IDENCE.

Where the person, object or subject referred to in a bequest is uncertain or does not precisely answer the description given to them in the will; or where there are two or more objects or subjects, which equally answer the description, resort may be had to parol evidence and surrounding circumstances to show what the testator intended by the expressions, which he used; and if such intention is so ascertained with sufficient certainty, the bequest is valid.

V. WILLS—UNCERTAINTY AS TO BENEFICIARIES—NAMES—COR-PORATIONS.

Where the name or description is erroneous and there is no reasonable doubt as to the person, who was intended to be named or described, the mistake will not defeat the bequest; and the same rule applies as well to corporations as to an individual.

VI. RELIGIOUS SOCIETIES—PRESBYTERIAN CHURCH—COMMITTEE OF PUBLICATION.

The incorporation of the "Presbyterian Committee of Publication," under the name of "The Trustees of the Presbyterian Committe of Publication" is not the incorporation of the "Presbyterian Church in the United States," nor of "any religious denomination."

VII. WILLS—TRUSTS—PRESBYTERIAN COMMITTEE OF PUBLICATION.

The bequest in the testator's will of one-half of the residue of his estate to the Presbyterian Committee of Publication at Richmond, Virginia, is a valid bequest and was intended to be a bequest to "The Trustees of the Presbyterian Committee of Publication," which by its charters had the legal capacity to take and is entitled to take the same.

VIII. WILLS—BEQUESTS.

The several charitable bequests of—

$500.00 to enclose the Mt. Pleasant Church and grave yard;
$4,000.00 to purchase a parsonage for Mt. Pleasant Church;
$250.00 for the Presbyterian Sunday School at Union;
$250.00 for the Sunday School at Centreville;
$250.00 for the Sunday School at Fairview school house;
$300.00 for the Home Missions of the Presbyterian Church;

and the remaining half of the residue of said estate to purchase a parsonage at Union, are uncertain as to the beneficiaries, and therefore void.

IX. *Stare Decises*—RULE OF PROPERTY.

Where a decision of this Court has been rendered establishing a rule of property, which has been repeatedly followed in like cases, it will not be disturbed or departed from except for the most cogent reasons, and upon a clear manifestation of error.

*A. N. Campbell* for appellant.

*M. M. Gilliam and J. Osborne* for appellees.

WOODS, JUDGE:

John V. Perry, a citizen of Monroe county, died therein on the — day of ——, 1885, having first made his will and a

codicil thereto, which was duly admitted to probate in the County Court of said county on the 10th of April, 1885, when William Steele, one of the executors named in the will, was qualified as the executor thereof.

The will and codicil thereto are as follows :

"I, John V. Perry, of the county of Monroe and State of W. Va., make and ordain my last will and testament in manner and form following, hereby revoking all other wills heretofore made by me :

"1st item. I direct my just debts and funeral expenses to be paid promptly out of the first moneys received by my executor.

"2d item. I give to my wife, Matilda, all of my household and kitchen furniture and farming tools, all of the stock, on the farm on which I now live, or which may be thereon at the time of my death, that she may want, the same to be selected by herself; also the farm on which I now live for life.

"3d item. I direct my executor hereinafter appointed to sell all of my personal property not otherwise herein disposed of ; also my lands known as the Morehead place in Greenbrier county, my land in Summers county and my lands in the State of Iowa. I also direct my said executor to sell the farm on which I reside after the death of my wife and the determination of her life-estate in said farm.

"4th item. The moneys arising from sales directed in last *preceding* item and from debts due me shall constitute the general fund of my estate.

"5th item. I give to Oliver, son of my brother, Nathan Perry, $300.00, to be paid to him out of the general fund.

6th item. I give to my former slave woman called Frank, $300, to be paid to her out of the general fund.

"7th item. I give to Dr. S. R. Houston $15.00 per year as long as he lives, and I direct my executor to provide for the payment of this annuity.

"8th item. I give to Jno. A. Nickell, Jas. Mann and Sam'l A. Houston $500.00, in trust for the following purpose, to wit, to enclose with a substantial fence the lot of ground on which the Mt. Pleasant Presbyterian Church stands, and the graveyard belonging thereto.

"9th item. I give to John A. Nickell, Jas Mann and Samuel A. Houston $250.00, in trust to buy books for the library of the Mt. Pleasant Presbyterian Sunday School.

"10th item. I give to John A. Nickle, Jas. Mann and Samuel A. Houston ($4,000.00) four thousand dollars, in trust for the following purpose, to wit, to buy a property suitable for a parsonage or a minister's residence, for the use and benefit of the Mt. Pleasant Presbyterian Church forever.

"11th item. I give to Geo. W. Hutchinson, Wm. Steele and Andrew H. Johnson $250.00, in trust for the following purpose, to wit, to buy books for the library of the Presbyterian Sunday School at Union.

"Witness my hand to this the first sheet of my will as aforesaid.

"JOHN V. PERRY.

"Witnesses :—M. S. CONNELL,
            B. F. IRONS.

"12th item. I give to Richard V. Shanklin, W. W. Pence and Rev'd M. H. Bittinger $250.00, in trust for the following purpose, to wit, to buy books for the library of the Sunday School at Centerville, Monroe co., W. Va.

"13th item. I give to Samuel A. Houston, Newton Dickson and Porter Hamilton $250.00, in trust for the following purpose, to wit, to establish a Sunday School at Fairview School House in Monroe co., West Va., and provide the same with a library.

"14th item. The gifts hereinbefore made are to be paid out of the general fund of my estate.

"15th item. The residue of my estate I give to John A. Nickell, Jas. Mann and Samuel A. Houston, in trust as follows: one-half thereof for the use and benefit of the Presbyterian Committee of Publication at Richmond, Virginia, the other half thereof to be applied to the purchase of a parsonage or minister's residence for the use and benefit of the Presbyterian Church at Union, West Va., forever.

"I hereby nominate, constitute and appoint M. A. Steele the executor of this my last will and testament, and I direct, should the said Steele decline to qualify as such executor, that my estate be committed to the sheriff of Monroe county.

"Witness my hand and seal this the 9th day of March, 1878.

"JOHN V. PERRY. [SEAL.]

"Signed, sealed and acknowledged by John V. Perry as his last will and testament in the presence of the undersigned, and witnessed at the request of the said John V. Perry, in his presence and the presence of each other.

"M. S. CONNELL,
"B. F. IRONS.

"CODICIL.

"I, John V. Perry, of the county of Monroe and State of West Virginia, do make and ordain this codicil to the last will and testament executed by me on the 9th day of March, 1878, and bearing date of that day, and to which M. S. Connell and B. F. Irons are subscribing witnesses: I hereby ratify and confirm my said will except in so far as the same is revoked or modified by this codicil.

"1 Item. I hereby revoke the gift of $300.00 to Oliver, son of my brother, Nathan Perry, as set forth in my said will, and I hereby give the said sum of $300.00 so given and revoked as aforesaid to William Steel and A. C. Houston, my executors hereinafter appointed, in trust, however, for the following purposes, to wit, for the sole and exclusive uses and purposes of the Home Missions of the Presbyterian Church in the United States.

"2 Item. I hereby invest my executors with discretion in the matter of selling my Morehead and other lands, directed to be done in my said will. I desire them to take such reasonable time, give such reasonable terms, in making said sale, as may be necessary in order to obtain a fair price therefor.

"I hereby revoke that clause of my will aforesaid constituting M. A. Steele, my executor, and in the event of his declination, directing my estate to be committed to the sheriff of Monroe county.

"I hereby nominate, constitute and appoint William Steele and A. C. Houston to be executors of my last will and testament with this codicil, which I have annexed thereto.

"In testimony whereof, I have hereunto set my hand and affixed my seal this the 2d day of January, 1882.

"JOHN V. PERRY. [SEAL.]

"Signed, sealed and acknowledged by John V. Perry as his codicil to his last will and testament in the presence of the undersigned, and witnessed at his request in his presence and in the presence of each other.

"M. S. CONNELL,

"ROBT. A. CURRY."

At May Rules, 1885, William H. Wilson a nephew, and Elizabeth Robinson and Sarah Ross, sisters of the testator, filed their bill in the Circuit Court of Monroe county, against his other heirs, distributees and said legatees, setting up the execution of the will, the probate thereof, the qualification of the executor, and alleging that the testator at his death was the owner of a large estate, real and personal; that his real estate in this State was worth at least $8,970.00, and that the same had been appraised at that value; that he directed all his lands to be sold, and his whole estate to be disposed of according to the provisions of his will; that his widow Matilda Perry had elected to take under his will and was in possession and enjoyment of the real and personal property devised and bequeathed to her.

The bill avers, that the Mt. Pleasant Presbyterian Sunday School, Mt. Pleasant Presbyterian Church, the Presbyterian Sunday School at Union, the Sunday School at Centreville, Monroe county, W. Va., the Presbyterian committee of publication, at Richmond, Virginia, the Presbyterian church at Union, W. Va., the Home Missions of the Presbyterian Church in the United States are neither natural persons nor corporations, but they are each and all of them unincorporated religious societies and congregations, whose members are perpetually changing, and that the bequests in said will for their use and benefit are charitable bequests; that the beneficiaries are indefinite and cannot be ascertained; and that the bequests for their use are absolutely void; that the bequest of $500.00 for the purpose of enclosing with a substantial fence the lot of ground on which the Mt. Pleasant church stands, and the grave yard belonging thereto, and the bequest of $250.00 for the purpose of establishing a Sunday School at Fairview school house are also void, as the beneficiaries are indefinite, unascertained and unascertainable.

The plaintiffs claim, that the said heirs and next of kin of

the testator are entitled to the whole of his estate excepting only the legacies bequeathed to Dr. Houston, and to the negro woman "Frank" and the personal property, and the life estate in his home farm devised to his widow; and they aver, that there is no necessity for a sale of the testator's real estate, which they elect to take in kind.

They pray that each and all the charitable bequests mentioned in the will may be declared void; that said heirs and next of kin of the testator be declared entitled to all his estate except the portions bequeathed to Dr. Houston, the woman Frank, and to his widow; that the executor may be restrained from selling the testator's real estate, and for general relief. A copy of the will was exhibited with and made part of the bill,

The "Trustees of the Presbyterian Committee of Publication," John A. Nickell, James Mann and Samuel A. Houston, trustees, and the executor Wm. Steele, answered the bill, to which the plaintiffs replied generally.

The joint answer of Nickell, Mann and Houston, in substance says, that the testator was a member of —— church, a Presbyterian Church in connection with the General Assembly of the "Presbyterian Church in the United States;" that he was accustomed to contribute to the use and benefit of the Trustees of the Presbyterian Committee of Publication in connection with his church; that he was interested in the work of the Committee of Publication whose object is to publish books, tracts and cards specially adapted to Sunday school libraries; that they believe that the testator intended the bequest, of one-half of the residue of his estate for the use of the "Trustees of the Presbyterian Committee of Publication" at Richmond, Virginia, which has been frequently called and known, as the "Presbyterian Committee of Publication" at Richmond, Virginia, and they refer to and formally adopt the answer of "The Trustees of the Presbyterian Committee of Publication," as part of their answer.

The answer of the executor admits the matters of fact alleged in the bill touching the execution of the will, the kinship of the parties alleged to be the heirs and distributees of the testator, and that all of the legatees of the charitable be-

quests of the will, except the Presbyterian Committee of Publication are neither natural persons nor incorporated societies. It expressly denies that the " Presbyterian Committee of Publication" at Richmond, Virginia, is unincorporated, and avers, that the said committee was incorporated by an Act of the Legislature of Virginia approved March 8th, 1873, and makes a certified copy of said Act, an exhibit with, and part of the answer. It further avers, that this is the only Presbyterian Committee of Publication at Richmond, Virginia; that the address of the Trustees of the Presbyterian Committee of Publication is as written by the testator; that the business cards, and business sign of said " Trustees of the Presbyterian Committee of Publication " as well as all its publications, designate said " Trustees of the Presbyterian Committee of Publication," as the " Presbyterian Committee of Publication; and that the preamble of the act of incorporation states, that the Trustees of the Presbyterian Committee of Publication at Richmond, Va., is the same as the Presbyterian Committee, &c.; and that the property now owned by said Presbyterian Committee of Publication at Richmond, Va., when increased by the bequest of the testator, will still fall far below $200,000.00, the maximum amount of property, which the act of incorporation authorizes it to acquire. These respondents claim, that the local congregations, Sabbath Schools, and other objects of the testator's bounty are described in the will with sufficient clearness and definiteness to enable them to take and hold the bequests given to them respectively, and the bequest to Sharklin, Spence and Bettinger, "in trust to buy books for the Sunday school at Centreville, Monroe co., W. Va., "was clearly intended for the Presbyterian Sunday School at that place, and claim that the lands should be sold as directed by the will.

The answer of The Trustees of the Presbyterian Committee of Publication avers, that by an act of the General Assembly of Virginia, approved March 8th, 1873, the very persons, who then composed the "Presbyterian Committee of Publication," were incorporated by the name of "The Trustees of the Presbyterian Committee of Publication," and by that name should have a perpetual succession and common seal, might contract and be contracted with, sue and be sued,

might acquire, receive, hold, possess and enjoy, and might rent, sell, convey and invest and otherwise manage or dispose of, as might seem most conducive to the interest and promotion of the benevolent purposes of the said "Presbyterian Committee of Publication" all lands, money or other property, real or personal, which might have been, or which might be, given or otherwise acquired for the use of said committee, *provided*, that the sum of money so acquired should not exceed $200,000.00.

The answer further averred, that the General Assembly of the "Presbyterian Church in the United States" at its first meeting held after the passage of said act of incorporation unanimously approved the charter so obtained from the General Assembly of Virginia; and authorized the Presbyterian Committee of Publication, as soon as an organization could be effected under said act of incorporation, to purchase a publishing house; that at a meeting of the trustees named in said act of incorporation, the charter was adopted and the corporation was fully organized, and by its secretary and treasurer consummated the purchase of the publishing house; that as said corporation, "The Trustees of the Presbyterian Committee of Publication," acquired, became possessed of, and has ever since held and enjoyed all property real and personal given or otherwise acquired for the benevolent purposes and uses of said committee; that this corporation is situated in Richmond, Virginia; that it is the only Presbyterian Committee of Publication at Richmond, Virginia; that it has for its object the publication and circulation of books, tracts, papers, cards, &c., approved by its members as a body corporate, which is composed of Presbyterians, and is under the control of the Presbyterian denomination, as its corporate name imports; and that the value of the property already acquired by said corporation, even when increased by the testator's bequest, is much less than $200,000.00; that the General Assembly of the Presbyterian Churches in the United States had recommended that all the churches within its jurisdiction should upon a certain Sabbath in every year take up a collection for the objects of this committee, which has been done, and the moneys so collected have been paid to said corporation.

It further avers that the testator was a member of the Presbyterian Church; that he was interested in the benevolent work of this corporation and made contributions for its use and benefit, as shown by his will and codicil; that the bequest to the Presbyterian Publishing Committee, is a good and valid bequest to "The Trustees of the Presbyterian Committee of Publication," which is lawfully entitled to receive and hold the same, and prays that its answer may be treated as its cross-bill, and the lands of the testator may be sold, as by the will is directed, the amount of the legacy ascertained and paid to respondent, and for general relief.

A certified copy of the Act of the General Assembly of Virginia, incorporating The Trustees of the Presbyterian Publishing Committee, is filed with and made part of the foregoing answer.

The bill was subsequently amended; but the only new matters introduced were certain portions of the "Book of Church Order" of the Presbyterian Church in the United States setting forth the several judicatures, defining their powers, giving a succinct history of the creation, powers and duties of the Presbyterian Committee of Publication, whereby it is alleged, that the "General Assembly" is the highest judicature of the "Presbyterian Church in the United States;" that it superintends the affairs of the whole church; that it concerts measures for promoting the prosperity and enlargement of the Church; that it has authority to institute and superintend the agencies necessary in the general work of evangelization, and has power to commit the various interests pertaining to the general work of evangelization to one or more commissions. This amended bill further alleges, that the General Assembly of the church at its session in 1861 acting by the authority conferred on it by said "Book of Order" adopted as *one of its agencies* in its general work of evangelization a commission composed of church members and committed to its charge the duty of printing and circulating the religious literature of the church, and named this commission "The Executive Committee of Publication," and fixed its place of business, and located said Executive Committee of Publication at

Richmond, Virginia, where it has ever since remained ; that this committee acts under the direction and control of the General Assembly and makes 'to it, an annual report of all its proceedings; that the General Assembly annually appoints members of said committee; that at its session in May, 1872, the General Assembly appointed as such Committee of Publication eleven gentlemen named in the bill, of whom six were ministers, and five were elders in the church who acted as such committee until the next meeting of the Assembly in May, 1873; that from the time of · its organization the Executive Committee of Publication had been carrying on its business in Richmond Virginia, under the name of and was known as the Presbyterian Committee of Publication ; and the business so conducted by the Executive Committee of Publication was the business of the Presbyterian Church, and a large amount of property belonging to said church was held by said Executive Committee of Publication, and that the church was by this means carrying on its own business through its own constituted and appointed agent—the said Executive Committee of Publication, *which is the church itself* doing business under that name !

The amended bill further alleged, that the act of the Legislature of Virginia approved March 8th, 1873, whereby the said members of the Executive Committee of Publication were incorporated, was an attempt to evade the Constitution of the State of Virginia; that on the 8th of March, 1873, the said Executive Committee was located at Richmond, Va., and carrying on its business there, under the name of the "Presbyterian Committee of Publication," and that the said "Executive Committee of Publication," is the same Presbyterian Committee of Publication mentioned in said act of the Legislature of Virginia ; that said act of the Legislature of Virginia is in violation of the constitution of Virginia and therefore void, and that all acts done or attempted to be done by the persons pretended to be incorporated thereby are also void ; that said act, if passed by the Legislature of this State, would be void, because it would be in conflict with Section 47 of Article 6 of its Constitution, and because such a corporation would be in violation of the public pol-

icy of the State of West Virginia, and that for these reasons "The Trustees of the Presbyterian Committee of Publication" can not carry on its business or hold property or sue in the courts of this State. The bill concludes with the same prayer as in the original bill.

The Trustees of the Presbyterian Committee of Publication and the widow answered the amended bill. The answer of the former, brought into the controversy no new matter, but it consisted principally in a repetition of the claim made in its former answer.

The answer of the widow Matilda Perry claimed that by the terms of the will all of the real estate of the testator was at once converted into personalty, but that she had not made and she could not make her election to claim under or to renounce the provisions of the will, until the court could finally determine this question, and asked the guidance of the court in this behalf, averring that, if the testator's real estate was in fact converted into personalty, she would renounce the will and claim her distributee's share of his estate. To these answers the plaintiff also replied generally.

On the 18th of March, 1886, the cause was heard upon the original and amended bills and exhibits filed therewith, upon the foregoing answers—the answer of the guardian *ad litem* of the infant defendants, general replications to said answers, the exhibits filed therewith, depositions of witnesses, orders of publication duly executed as to the absent defendants, and bill taken for confessed as to the defendants, who have not appeared and answered. On consideration whereof the court was of opinion and accordingly decreed, that the legacies given by the testator to his widow, Matilda Perry, and to Dr. S. R. Houston and to the negro woman Frank were good and valid bequests; and also that the legacy given in the following language in said will, viz.: "The residue of my estate I give to John A. Nickell, Jas. Mann and Samuel A. Houston in trust as follows: One-half thereof for the use and benefit of the Presbyterian Committee of Publication at Richmond, Virginia," was a good and valid bequest, and that the corporation "The Trustees of the Presbyterian Committee of Publication was entitled thereto" and that all the other legacies specified in said will, which were not revoked

by the testator, that is to say such others as are mentioned in the eighth, ninth, tenth, eleventh, twelfth, thirteenth and fifteenth items of the will, and the legacy mentioned in the codicil, were vague, and uncertain, and were therefore inoperative and void.

By a subsequent decree rendered on the 10th of June, 1886, it was further adjudged that the widow of the testator was not entitled to hold the lands devised to her for life, and also have dower assigned to her in the other lands owned by her husband at the time of his death; that she was not entitled to any other part of the personal estate of the testator than that given her by his will, without renouncing the provisions thereof; and that, whether she renounced the same or not, she was not entitled to any part of the money, that may arise from the conversion of the real estate by reason of the directions of the testator's will; and she was allowed thirty days after the adjournment of the court, within which to make her election whether she would or would not renounce the provisions made for her in said will.

From said decree of the 18th of March, 1886, the plaintiff, William H. Wilson, obtained an appeal to this Court, and has assigned the following errors in said decree:

1st. The court erred, because the Presbyterian Committee of Publication is an unincorporated religious charitable institution, the members of which are indefinite and unascertainable.

2d. The act attempting to incorporate The Trustees of the Presbyterian Committee of Publication is in conflict with Section 17 of Article V of the Constitution of Virginia, and is therefore null and void.

3d. Such an Act as that of the Legislature of Virginia of March 8th, 1873, attempting to incorporate The Trustees of the Presbyterian Committee of Publication could not be passed by the Legislature of the State of West Virginia, because it would be in conflict with Section 17 of Article VI of the Constitution of this State and contrary to the policy of this State; and a corporation organized under such an Act could not carry on business or sue in the courts in this State.

The importance of the questions involved in this contro-
versy is a sufficient apology for the preceding statement of
the facts connected with it.   The testimony of the witnesses
and the documentary evidence filed in the cause fully es-
tablish the grounds, on which The Trustees of the Presbyte-
rian Committee of Publication claim the bequest made by
the testator to Nickell, Mann & Houston, in trust for the use
and benefit of the Presbyterian Committee of Publication
at Richmond, Virginia.  The evidence clearly shows, that
from 1861 down to March 8th, 1873, the General Assembly
of the Presbyterian Church in the United States had insti-
tuted, appointed and superintended an agency for the printing
and circulation of the religious literature of the church,
which consisted of a committee of eleven persons, all of
whom were members of the church, which was named the
Executive Committee of Publication, located in the city of
Richmond, Virginia, which was equally well known by the
name of the Presbyterian Committee of Publication; and
that after the same had been duly incorporated by the Leg-
islature of Virginia, and the corporate name of " The Trus-
tees of the Presbyterian Committee of Publication," it
describes itself on its business cards and business sign and in
all its publications as the Presbyterian Committee of Publi-
cation.

The testator is shown to have been a member of the Pres-
byterian Church, deeply interested in all of its benevolent
enterprises and of his means contributing liberally for the
advancement of their interest.

The property placed in the hands of this committee, con-
sisted of the voluntary collections and offerings of the mem-
bership of the whole church, and were used exclusively for
the publication and circulation of the religious literature of
the church consisting of hymn books, catechisms, Sabbath-
School-lessons, Book of Church Order, religious newspa-
pers, tracts, cards. &c., for the dissemination of relig-
ious truth, as held and taught by the Presbyterian
Church.

This " Presbyterian Committee of Publication " consisted
of eleven members of the Presbyterian Church annually ap-
pointed by the said General Assembly, who derived all

their power and authority from that body. By said act of the legislature of Virginia approved March 8th, 1873, the individuals then composing the Presbyterian Committee of Publication, and their successors, became a body politic and corporate by the name of " The Trustees of the Presbyterian Committee of Publication," with power to fill vacancies in their own body, to be chosen from the said " Presbyterian Committee of Publication " appointed according to the constitution of said committee, which, we have seen, were annually appointed by said General Assembly. This limitation on the power of the corporation to fill vacancies occurring in its own body makes its continued existence depend upon the existence of the Presbyterian Committee of Publition, and without it, the corporation can not exist. Because of this fact the appellant in his first assignment of error insists, that the Presbyterian Committee of Publication is an unincorporated religious charitable institution, the members of which are indefinite and unascertainable, while his amended bill avers, and his counsel in argument maintains, that the " Presbyterian Committee of Publication at Richmond, Virginia" and the Executive Committee of Publication of the General Assembly of the Presbyterian Church in the United States, *are one and same*, and in fact nothing more nor less than the said church itself holding its property, and conducting its business through its regularly constituted agent.

Pursuing this line of argument the counsel for the appellant rising with the courage of his convictions announcing his conclusions says : " Having established that this (Presbyterian Committee of Publication) is the church itself holding property and conducting its own business, I submit, that the act of the legislature of Virginia approved 8th March, 1873, is unconstitutional and void, because it attempts indirectly to incorporate a church, or religious denomination, which is prohibited by section 17 of Article V. of the Constitution of Virginia. It will not do to say, that this is a benevolent society that is incorporated by this act, and by its mere change of name avoid the Constitution. *The evidence is too clear, that it is the church itself.*

We may best answer this argument by following it to its

logical results. If it be admitted, that the appellants' counsel has established the astounding proposition, that the "Presbyterian Committee of Publication" has in fact become the "Presbyterian Church," it follows that this "Committee" is invested with all the authority, charged with the performance of all of the duties, and of necessity must exercise all the sacred functions of the Presbyterian Church in the United States. In the exercise of these powers and functions and in the performance of these duties this "Committee" must receive members, elect elders, choose deacons, ordain ministers, administer the sacraments of baptism and the Lord's Supper, constitute sessions, Presbyteries, Synods and even the General Assembly to which the committee itself owes its existence.

Webster defines the word "Church" as follows:

1st. "A formally organized body of Christians believing and worshiping together.

2d. "A body of Christian believers observing the same rites and acknowledging the same ecclesiastical authority.

3d. "The collective body of Christians or those who acknowledge Christ as the Saviour of mankind."

He defines the word "Denomination" as follows:

"A class or collection of individuals called by the same name." "A set."

It is apparent that the 3d definition of the word "church" given by this lexicographer will include those mentioned in the first and second definitions by whatsoever name they may be called, as well as all religious denominations, which acknowledge Christ as the Savior of mankind.

By the Book of Church Order of the Presbyterian Church in the United States the word "church" is defined: "A number of professing Christians with their offspring associated together for divine worship and Godly living agreeably to the scriptures and submitting to the lawful government of Christ's kingdom."

Before, and on the 8th of March, 1873, there was existing in the United States a large influential, intelligent and organized body of Christian men and women with their offspring, of one faith and one doctrine, observing the same rites, and acknowledging the same ecclesiastical authority,

known as the "Presbyterian Church in the United States." Its
highest court is its General Assembly, which represents in
one body all the churches thereof, and constitutes the bond
of union, peace and correspondence among all its congrega-
tions and courts.

This General Assembly is clothed with power to concert
measures for promoting the prosperity and enlargement of
the church, to institute and superintend the agencies neces-
sary in the general work of evangelization, to superintend
the affairs of the whole church, to commit the various in-
terests pertaining to the general work of evangelization to
one or more commissions, and in general to recommend
measures for the promotion of charity, truth and holiness
through all the churches under its care.

One of the most important and necessary agencies for the
promotion of the prosperity and enlargement of the church in
its general work of evangelization is the publication and cir-
culation of a pure church literature, perfectly in accord with
its profession of faith and doctrine.  To enable the church to
accomplish this benevolent purpose the General Assem-
bly instituted and superintended an agency named the "Exec-
utive Committee of Publication of the General Assembly
of the Presbyterian Church in the United States," but
equally well known by the name of the "Presbyterian Com-
mittee of Publication," and charged it with the performance
of this great work, and committed to its care and manage-
ment all its funds available for that purpose, and this agency
was engaged in the performance of this work on the 8th of
March, 1873.

Up to the time when this corporation was created and or-
ganized, no one ever supposed that the Presbyterian Church
in the United States had ceased to exist, or that its existence
had been merged in the "Presbyterian Committee of Publi-
cation," which had been instituted by the General Assembly
of the said church for a specific purpose, existing only during
its pleasure, and liable at any time to be destroyed by the
power which created it.

If it should ever be the pleasure of the General Assembly
to abolish the Presbyterian Committee of Publication, the
"Presbyterian Church in the United States" will continue

to exist, with all its vital powers unimpaired.  In the presence of this truth, and in view of the absurdity of the Presbyterian Committee of Publication attempting to exercise the functions of the church, who will contend that the "Committee" is in fact the "Presbyterian Church in the United States," or that a legislative act which confers upon the individuals who from time to time compose the Presbyterian Committee of Publication the powers of a corporation to enable them to acquire, hold and use the property necessary to the efficient discharge of their duties is an act incorporating the "Presbyterian Church in the United States?"

This corporation by the very terms of its charter will be destroyed by the same breath, which extinguishes the existence of this committee, from the members of which alone, vacancies in the board of trustees can be filled.

So far from being merged in the "Presbyterian Committee of Publication," whether incorporated or unincorporated, the "Presbyterian Church in the United States" is the Principal; the committee is its agent for a specific purpose; the church is the Master, the committee its faithful servant, bringing into its treasury other "five talents," besides those entrusted to its keeping.  If the "Presbyterian Committee of Publication," before its incorporation was not the same as the Presbyterian Church in the United States, then the incorporation of the individuals composing that "Committee" was not the incorporation of the "Church," and therefore said Act of the Legislature of Virginia approved March 8th, 1873, was neither an evasion nor a violation of the 17th section of Article V of the Constitution of Virginia.

The "Trustees of the Presbyterian Committee of Publication" by the act of incorporation, are expressly authorized to acquire, receive, hold, enjoy, rent, sell, convey, invest and otherwise manage as to them may seem most conducive to the interest and the promotion of the benevolent purposes of said Presbyterian Committee of Publication, all lands money or other property real or personal which may be given or otherwise acquired for the use of said committee," and therefore unless otherwise incapacitated from doing so, The Trustees of the Presbyterian Committee of Publication will be entitled to take the legacy given by the 15th

item of testator's will to the "Presbyterian Committee of Publication;" for a bequest to a corporation capable to take is, and always was valid as a charitable gift. (3 *Gallego's Ex'rs* v. *Att'y Gen'l, &c.,* 3 Leigh. 450.) It is unnecessary for us to consider, whether the charitable bequests of the testator, in the case under consideration, are such as could or would have been supported and enforced at common law by a court of equity independently of the Statute of Charitable Uses, of 43 Elizabeth. By an unbroken line of decisions of the Court of Appeals of Virginia from the case of *Gallego's Ex'rs* v. *Attorney Gen'l, &c.,* 3 Leigh 450—following the decision of the Supreme Court of the U. S. in *Baptist Association* v. *Hart,* 4 Wheat 1, to the formation of this State, wherever the same questions have arisen this court has uniformly held that charitable bequests stand on the same footing as all others and will be sustained or rejected by courts of equity ; and that, where the objects of such charitable bequests are indefinite or uncertain, courts of equity in this State, have no jurisdiction to enforce them ; and in every case where the conveyance, bequest or devise, is uncertain as to the beneficiaries it has been held void, for the *reason that it is uncertain.*

In the case of *Gallego's Exrs.' supra.* the testator devised to three trustees, their heirs and assigns forever a moiety of a certain lot of land in Richmond, Va. "Upon trust to permit all and any person and persons belonging to the Roman Catholic Church, as members thereof, or professing the Roman Catholic religion, and residing in the said city of Richmond at the time of his death, to build a church on said moiety of the said lot for the use of themselves and of any other person and persons of that religion who may hereafter reside in the said city of Richmond."

He also "directed his Executors to lay by $2,000.00 to be distributed among needy, poor and respectable widows; and to pay $1,000.00 towards the support of the Roman Catholic Chapel, should the same be continued at his death; and if the Roman Catholic congregation shall determine to build a chapel at Richmond, to pay $3,000.00 towards its accomplishment."

Upon an information filed by the Attorney General to en-

force these charitable bequests and devise, it was held by
the Court of Appeals, that they were *void, because they were
uncertain as to the beneficiaries;* and that courts of chancery
in Virginia had no jurisdiction to decree charities, where
the objects are indefinite and uncertain.   Tucker, J., in his
opinion in this case said : " It is not doubted, that many
charitable gifts were known and recognized before the Stat-
ute of Elizabeth; that charitable gifts for meritorious pur-
poses, not within the Statutes of Mortmain were doubtless
held good and enforced, where the beneficiary or grantee
was a person natural or artificial, who was capable to take,
and that a bequest to a corporation capable to take was
valid as a charitable gift."

In *Janey's Exr.* v. *Latane,* 4 Leigh 327, the testator be-
queathed to the school commissioners, and their successors of
South Farnham district, Essex county, for the schooling of
the poor children of that district, $1,000.00 to be put out on
interest, and the interest only to be applied for the school-
ing of said poor children.   These Commissioners not being a
corporate body, it was held the bequest was void.

The principles of law in regard to charitable bequests as
announced in the case of *Gallego's Exrs. supra,* are ex-
pressly re-affirmed and approved by the Court of Appeals of
Virginia in *Brook* v. *Shacklett,* 13 Gratt. 301, and in *Seaburn,*
*Exr.,* v. *Seaburn,* 15 Gratt. 423.   In the last named case the
testator directed his executor out of the money of his estate
to have built a good and comfortable brick church, with a
comfortable gallery for colored persons on the land attached
to Mulberry Island Church ; that $2,000.00 of his estate be
invested and the interest applied to the support of a compe-
tent minister to preach to the church, which he desired to be
built ; that his executor should also have built a good, com-
fortable brick church at a place called Upper Grafton, in
York county, for the benefit of the Old Baptist denomina-
tion, with a comfortable gallery for colored persons, to be
paid out of his estate ; and that the surplus of his estate, if
any, should be invested in the same manner as said $2,000.00
and the interest or dividend arising therefrom should be ap-
plied for the payment of the minister to preach in the
churches which he desired to have build.

These bequests upon the principle amended in *Gallego's Exrs. supra* were held to be inoperative and void.

The same principle is announced in *Virginia* v. *Levy,* 23 Gratt. 21; *Kelly* v. *Love,* 20 Gratt. 124; *Wheeler* v. *Smith,* 9 Hon. 76.

If a trust be created in a party but the terms by which it is created are so vague and indefinite, that courts of equity can not clearly ascertain either its objects or the persons who are to take them, the trust will be held entirely to fail, and the property will fall into the general fund of the author of the trust. (Story's Eq. Juris. § 979.)

In *Wright* v. *Alkins,* 1 Turn. & Russ. 157, it was said by Lord Eldon: "In order to determine, whether a trust of this sort is a trust, which a court of equity will interfere with, is a matter of observation—first, that the words should be imperative; secondly, that the subject must be certain; and thirdly, that the object must be certain as the subject."

In *Carpenter* v. *Miller,* 3 W. Va. 174, the testator by a codicil to his will, made the following devise: "After the death or marriage of my wife, I devise that my personal property be sold, and after the payment of the one hundred dollars for the removal of the negroes, I give and bequeath the residue, together with all my lands and stock, consisting of five shares, in the James River and Kanawha Company to my friends Hartnell I. Chandler and Lewis A. Alderson to be equally divided between them in fee simple, and request them to give the entire proceeds to the propogation of the Gospel in foreign lands."

This bequest was held void for uncertainty.

In *Bible Society* v. *Pendleton, trustee,* 7 W. Va. 79, the testator by the 11th clause of his will made the following bequests: $2,000.00 towards the founding of an academy in or near the town of Martinsburg to be under the control of the Presbytery of Winchester (Old School) to be paid into the hands of such person as said Presbytery may authorize to receive the same; $1,000.00 to the trustees of the Presbyterian congregation at Martinsburg (Old School) to be applied by them towards the purchase of a lot and the erection thereon of a house, or the purchase of a house and lot and fitting the same for the residence of the pastor of the said congregation;

$500.00 to the trustees of the Board of Foreign Missions of the Presbyterian Church in the United State of America to be applied to uses and purposes of said board and under its direction; $500.00 to the trustees of the Board of Missions of the General Assembly of said church towards the fund for superannuated ministers and their families; $500.00 to the same Board of Missions; 500.00 to the American Bible Society formed in New York in 1816 to be applied to the charitable uses and purposes of said society. All these bequests were held by this Court to be void under the statutes of Virginia and the decisions of her courts for uncertainty. Judge Paull, delivering the opinion of the court, says: "We are not informed by the bill, answer, or any other pleading, or by any evidence found in the record, who or what the parties are, whether natural persons or corporations to whom bequests have been made under the 11th clause of the will. We have moreover as little information as to who are the beneficiaries of these respective bequest, who shall find, or who shall determine them; they are not named in a form or manner, by which they can be ascertained with certainty, and thereby be made the recipients of the bounty of the will. These indefinite charities, however it may be in other States, have in Virginia been held invalid at common law in her highest court, and since the repeal of the statute of 43 Elizabeth, by her Legislature been held incapable of execution. The want of clearly recognized grantees, or clearly recognized beneficiaries constitutes the indefinite character of these charities, and renders them void at common law.

In declaring void for uncertainty the bequests in *Gallego's Exr's supra,* Judge Tucker said: "It is not that charity is banished from the State. Its benign and salutary influence may warm and animate every heart, and lead to a generous munificence as the daily habit of our lives, without exposing the State to the evils, which have always flowed from what are called conveyances in mortmain," and Judge Paull adds, "It is not to dry up the streams of charitable feeling and action, but to control to a limited extent, the manner of their operation for what has been deemed in the policy of the law, sufficient reasons."

In *Knox* v. *Knox*, 9 W. Va. 124, the bequest was of the residue of the estate of the testatrix to certain trustees, "to be securely invested, and the dividends, rents and interest arising therefrom to be appropriated solely for repairing and keeping in good order Mountwood Cemetery near the city of Wheeling, and if any of said income remain after keeping said cemetery in good repair, such remainder may be expended in beautifying the same." This Court held, that said bequest was void, because it created an indefinite trust or charity and that the bequest devised to said trustees should go to the next of kin of the testatrix.

In *Brown* v. *Caldwell*, 23 W. Va. 187, there was a grant of land for a consideration to a trustee upon trust that the trustee " shall at all times permit all the white religious societies of Christians, and the members of such societies to use the land as a common burying ground and for no other purpose." This grant was void for the want of certainty in the beneficiaries. Judge Snyder delivering the opinion of the Court in this case said " It is difficult to conceive of any thing more vague, indefinite and general in its character. The societies here designated are neither local nor fixed. They in fact embrace the whole Christian world, and are not only indefinite but unascertainable. Under the decisions of this Court this deed is clearly void for want of *cestui que trust*." The same principal was announced by this Court in *Carskadon* v. *Torreyson*, 17 W. Va. 43.

In *Kain* v. *Gibboney*, 101 U. S. 362, the testatrix after making various pecuniary bequests, among them one of $500.00 to Richard V. Wheelan, Roman Catholic Bishop of Wheeling, Virginia, and successors in that Church dignity contained the following provision :—" In the event that I may hereafter become a member of any of the religious communities attached to the Roman Catholic Church, and am such at the time of my death, then it is my will that all the foregoing bequests and legacies be void, and that my executors hereinafter named shall pay over the whole of the property or other thing, after disposing of the same for money, to the aforesaid Richard V. Wheelan, bishop as aforesaid, or his successor in said dignity, who is hereby constituted a trustee for the benefit of the community, of which I may be a mem-

ber, the said property or money to be expended by the said trustee for the use and benefit of said community."

The testatrix after making her will became a member of an unincorporated religious community attached to the Roman Catholic Church known as the "Sisters of Saint Joseph," and was so at the time of her death.

Wheelan brought suit to recover this bequest, and died, and John J. Kain having been appointed Bishop of Wheeling the suit was revived in his name.

The bill having been dismissed on demurrer, Kain appealed.

Justice Strong delivering the opinion of the Supreme Court of the United States said, " True it is that generally a trust will not be allowed to fail for want of a trustee; courts of equity will supply one. But if it could be conceded that Wheelan was in his lifetime capable of taking the bequest, and that Bishop Kain is capable of taking and holding after the death of his predecessor, a greater difficulty is found in the uncertainty of the beneficiaries, for whose use the trust was created. Nor is it the community attached to any local church which is designated, but a community attached to the Roman Catholic Church, wherever that church may exist. Its members must be constantly changing, and it always must be uncertain, who may be its members at a given time. No member can ever claim any individual benefit from the bequest, or assert that she is a *cestui que trust;* and the community having no legal existence can never have standing in court to call the trustees to account. This bequest is therefore plainly invalid unless it can be supported as a charity." But the general law of the State (Virginia) is recognized to be as in *Gallego's Ex'rs* v. *Attorney General,* and therefore the bequest can not be sustained as a charity."

But we are asked by counsel for other of the appellees than The Trustees of the Presbyterian Committee of Publication, to disregard this unbroken line of decisions in Virginia, and in this State, and upon the reasonings of the Supreme Court of the U. S. in *Vidal* v. *Girard's Exr's,* 2 How. 127, and in the case of *Protestant Episcopal Education Society* v. *Churchman's Adm'r,* decided by the Court of Appeals of

25

Virginia, at its September term, 1885, and reported in Va. Law Journal for Jan'y, 1886, to reverse the line of these decisions.

The decision of the Supreme Court of the U. S. in the case of *Vidal* v. *Girard's Ex'rs*, was based upon the decision of the Supreme Court of Pennsylvania in the case of *Limmerman* v. *Andrews*, decided at its January term, 1844, that the conservative provisions of the Statute 43 Elizabeth, chap. 4, have been in force in Pennsylvania by common usage and constitutional recognition, and not only these, but the more extensive range of charitable uses which chancery supported before that statute and beyond it, and that this part of the common law was in force in Pennsylvania though no court having equity powers now exists, or has existed capable of enforcing such trusts. And proceeding to distinguish the case under consideration from the case of *Baptist Association* v. *Hart's Ex'or*, 4 Wheat 1, Justice Story delivering the opinion of the Court says:

"There are two circumstances, which materially distinguish that case from the one now before the court. The first is, that that case arose under the law of Virginia, in which State the Statute of 43 Elizabeth, chap. 4 had been, expressly and entirely abolished by the legislature, so that no aid whatsoever could be derived from its provision to sustain the bequest. The second is, that the donees (trustee) were an unincorporated association, which had no legal capacity to take and hold the donation in succession for the purposes of the trust, and the beneficiaries also, were uncertain and indefinite. Both circumstances therefore occurred; a donation to trustees incapable of taking, and beneficiaries uncertain and indefinite."

In the case of the *Protestant Episcopal Education Society* v. *Churchman's Reps. supra*, the testator bequeathed money to be invested by a fiduciary, giving ample security, in safe interest-bearing funds, the interest only to be applied to the use of his legatee during her life, and at her death, "the principal and unexpended interest to be paid to the 'Trustees of the Protestant Episcopal Education Society in Virginia,' (incorporated in 1875) said bequest to be used exclusively for educating poor young men for the Episcopal ministry

upon the basis of evangelical principles now established."
On the 8th of Jan'y, 1875, two bishops, twelve clergymen,
and ten laymen, of the Protestant Episcopal Church in the
Diocese of Virginia, were by their charter constituted " a
body politic and corporate by the name and style of " The
Protestant Episcopal Education Society in Virginia; with
perpetual succession and a common seal, with capacity to
sue and be sued, plead and be impleaded, and with power
to receive, hold and purchase, to them and their successors
forever lands and tenements, money and other chattels, and
dispose of and manage the same."   By the 2d section of the
charter, the declared object of the Society is " the education
or aiding in the education of such young men as in the judg-
ment of said trustees, or their successor, or of any executive
committee duly appointed by them shall seem best."

" This is a corporation not only made legally capable of
taking and using property and money for educational pur-
poses, but having also the power of appointment and selec-
tion conferred; poor young men are to be the recipients, and
they are to be selected in the way pointed out in the char-
ter."

After a careful examination of the opinion of the Court of
Appeals in the foregoing cause, we are not moved to depart
from the line of safe precedents established by the Court of
Appeals of Virginia, from the time of the decision of *Gal-
lego's Ex'rs* v. *Attorney General supra*, and followed by
this Court to the present time, by reason of the arguments or
authorities relied on by that court in disapproving the de-
cision in *Gallego's Ex'rs*, and in *Baptist Association* v.
*Hart's Ex'rs*, 4 Wheat 1; and more especially, because the
bequest to the Protestant Episcopal Education Society, then
under consideration by that court, was by its own adjudica-
tion held to be a valid bequest under the provisions of chap-
ter 77, of the code of Virginia, of 1873, "and that that chap-
ter clearly validates and makes enforceable *all gifts for such
purposes*, subject to certain restrictions therein contained."
Assuming as correct the construction placed by that court on
that section of the Code of Virginia, and that the bequest
then under its consideration was valid and enforceable under
its provisions, it seems to us, that the reasonings of that court,

as well as its criticisms upon the well settled principles announced by the Supreme Court of the United States in *Baptist Association* v. *Hart's Ex'rs*, 4 Wheat 1, and in *Gallego's Ex's* v. *Attorney General*, 3 Leigh 450, had very little weight in determining the question whether said bequest to the Protestant Episcopal Education Society, was valid or not.

This Court in the case of *Clark* v. *Figgins*, reported in 27 W. Va. 663, had this question under consideration and upon a careful review of all the authorities announced its conclusion, as follows: "Where a decision has been rendered in the State of Virginia, and has been followed in two other cases in Virginia before the creation of this State, it will be followed by this Court without inquiring into the grounds on which said decisions are based." We do not however renounce our right, to review, or even depart from such precedents, or modify or even reverse such rulings, but we will not do so "except for very cogent reasons, and upon a clear manifestation of error."

We are therefore of opinion that the bequests made by the testator John V. Perry, of $500 for the purpose of enclosing with a substantial fence the lot on which Mt. Pleasant Church stands, and the grave yard belonging thereto; of $250.00 to buy books for the library of the Mt. Pleasant Sunday School; of $4,000.00 to buy a property suitable for a parsonage or minister's residence for the use of Mt. Pleasant Presbyterian Church; of $250.00 to buy books for the library of the Presbyterian Sunday School at Union; of $250.00 to buy books for the library of the Sunday School at Centreville, Monroe county, W. Va.; of $250.00 to establish a Sunday School and provide a library therefor at Fairview School House in Monroe county, W. Va.; of $300.00 for the uses and purposes of the Home Missions of the Presbyterian Church in the United States, and the bequest of the moiety of the *residue* of his estate to John A. Nichol, Jas. Mann and Samuel A. Houston in trust, to purchase a parsonage or minister's residence for the use and benefit of the Presbyterian Church at Union, West Virginia, forever, are inoperative and void for uncertainty in the beneficiaries.

We have already seen that the incorporation of the "Trus-

tees of the Protestant Episcopal Education Society in Virginia, for the education of such men as in the judgment of said trustees or their successors, or of any executive committee duly appointed by them shall seem best," has been recognized and held to be a valid act by the Court of Appeals of Virginia, which it could not have done, if unauthorized by the 17th Sec. of Article 5 of the Constitution of Virginia, or if in controvention of its settle public policy. Neither of these is an open question in Virginia; and as the Constitutional provision in this State is identical with that of Virginia, we are of opinion that there is nothing in the charter, or purposes of "The Trustees of the Presbyterian Committee of Publication" in violation of the public policy of this State, to prevent it from taking and holding property in this State for the general purposes of the corporation. It is true that the testator in some slight degree misdescribes this legatee corporation, but the pleadings and the proofs clearly show who was intended by the testator as the object of his bounty. The general rule on this subject is, that, where the name or description of the legatee is erroneous, and there is no reasonable doubt as to the person intended to be named or described, the mistake will not defeat the bequest; and this rule applies as well to corporations as to a natural person.

In the case of *Smith's Ex'x* v. *First Presbyterian Church of Bloomsbury*, 26 N. J. Eq. 132, it was held, that a bequest to the " To the Board of Publication " was a sufficient description of " The Trustees of the Presbyterian Board of Publication" and the latter were entitled to take the bequest. The same principle is announced in *Executors of Baldwin* v. *Baldwin*, 3 Hall N. J. Chy. 211 ; *Button, Ex'r* v. *American Tract Society*, 23 Vt. 336 ; *Lefever* v. *Lefever*, 59 N. Y. 434 ; *Straw* v. *Societies*, 67 Me. 493 ; Ang. & Ames. on Corp., sec 99 ; *Howard* v. *American Peace Society*, 49 Me. 288 ; *Trustees* v. *Peasely*, 15 N. H. 317 ; *Connolly* v. *Pardon*, 1 Paige 291 ; *Thomas* v. *Thomas*, 6 T. R. 676 ; *McAllister* v. *McAllister*, 46 Vt. ; *Newell's Appeal*, 24 Pa. St. 197 ; *Marinds' Adm'r* v. *McPhail*, 10 Leigh 199 ; *Roy's Ex'r* v. *Rowzie, &c.*, 25 Gratt. 599.

In the case of *Roy's Ex'rs supra* a bequest to the Bap-

tist Theological Seminary in South Carolina was held, upon the evidence to have been intended to be a bequest to the " Southern Baptist Theological Seminary, " which was shown to be a Baptist theological institution in South Carolina and duly incorporated by the legislature of that State, which by its charter was authorized to hold, possess and enjoy all property real and personal which may be given, granted or devised to it, not to exceed at any one time more than $500,000.00, and that a bequest to it by a testator in Virginia is valid, it appearing that the bequest will not increase its funds beyond $500,000.00.

And in that case the Court of Appeals of Virginia announced the rule to be, that where the person, or object, or subject referred to in a bequest is uncertain, or does not answer precisely the description given them in the will; or where there are two or more objects or subjects which equally answer the description, resort must be had to parol evidence and the surrounding circumstances to show what the testator intended by the expressions which he used and if such intention is so ascertained with sufficient certainty the bequest is valid.

In all the cases cited on this question the courts admitted parol evidence to remove the uncertainty or ambiguity appearing in the description of the legatee or the subject of the bequest.

We are therefore brought to the conclusion, that the act of the legislature of Virginia incorporating " The Trustees of the Presbyterian Committee of Publication, " is not in violation of the Constitution of Virginia, nor hostile to the public policy of this State; that said corporation has legal capacity to take and hold real and personal property in this State for its corporate purposes not exceeding at any one time $200.000.00; that the bequest made by the testator, John V. Perry, of one moiety of the residue of his estate to the Presbyterian Committee of Publication, at Richmond, Virginia, was intended to be made to " The Trustees of the Presbyterian Committee of Publication, " and the same is valid.

The decree of the Circuit Court of Monroe county, rendered in this cause on the 18th day of March, 1886, being in

accordance with conclusions herein expressed, we are of opinion, that there is no error therein; and the same is therefore affirmed with costs and $30.00 damages.

* * *

Opinion by GREEN, JUDGE:

I differ from the other judges in this case in this, that the act of the legislature of Virginia incorporating the individuals composing the "Executive Committee of Publication" commonly called the "Presbyterian Committee of Publication" by the name and style of "The Trustees of the Presbyterian Committee of Publication" I regard as an evasion of or in violation of Section 17 Art. V of the Constitution of Virginia, because, as I understand this act, "The Trustees of the Presbyterian Committee of Publication" hold all lands or other property, which they may acquire and dispose of or manage it, as to them may seem most conducive to the interest and promotion of the benevolent purposes of the said "Presbyterian Committee of Publication;" and as this Presbyterian Committee of Publication is appointed by the General Assembly of the Presbyterian church in the United States annually and is under their absolute control and is unincorporated, "the benevolent purposes of the Presbyterian Committee of Publication" must be the same as the benevolent purposes of the General Assembly of the Presbyterian Church in the United States, and the mode of carrying out such benevolent purposes may be changed by the General Assembly at its pleasure. The effect of this act is the same, as though it incorporated the General Assembly of the Presbyterian Church in the United States and authorized it to hold real and personal property and dispose of it, as it might think proper and conducive to the interest of said church. Such act would be clearly unconstitutional both in Virginia and in West Virginia; and no such corporation would be allowed to hold property in this State, no matter where incorporated, as it would clearly be in violation of our well established public policy. But the other members of the Court think, that this corporation incorporated by this act of the Virginia legislature can use its property real and personal only in printing

and circulating religious books, papers and cards, &c., as re-cited in the preamble of the act; and that the General Assembly of the Presbyterian Church in the United States or their Executive Committee of Publication can neither modify, alter nor enlarge the mode, in which the property or funds of this corporation are to be used. So that, while the directors of said incorporated company are appointed by the General Assembly of the Presbyterian Church of the United States, yet they can not control the use to be made of the property or funds of said incorporation, whether real or personal, but it must always be used for the purposes specified in the preamble of said act of incorporation. If I concurred in this interpretation of the act of incorporation, I should concur in the syllabus in this case; for I regard as constitutional both in this State and in Virginia an act of incorporation for objects specified in this act and not prohibited by the constitution or its spirit, such as the publication of books of a religious character. But the case is entirely changed, if the corporation is the mere hand of a church, which by the constitution of both these States can not be incorporated. So I regard these "Trustees of the Presbyterian Committee of Publication." And Judge Snyder concurs in this view, and if he interpreted this act of incorporation as I do, he would hold it an evasion and violation of the constitution. The Court hold otherwise because they interpret differently the act of incorporation. I concur in the syllabus except points I, II, III, which I consider incorrect, because I differ from the other members of the Court as to the character of the corporation known as "The Trustees of the Presbyterian Committee of Publication."

AFFIRMED IN PART.    REVERSED IN PART.